WILFRED W. RITER et al., appellees, v. KEOKUK ELECTRO-METALS COMPANY, appellant.

No. 48881.

(Reported in 82 N.W.2d 151)

APRIL 3, 1957.

Boyd, Walker, Huiskamp & Concannon, of Keokuk; McManus & McManus, of Keokuk, and Pollard, Palmer & Lawse, of Fort Madison, for appellant.

Hollingsworth & Hollingsworth, of Keokuk, and Rendlen & Rendlen, of Hannibal, Missouri, for appellees.

OLIVER, J.—This is an action at law, instituted in 1949, under section 657.1, Code of Iowa, 1946 (1950, 1954), to abate and enjoin an alleged nuisance. The petition alleges it is a class action by six named plaintiffs, each of whom occupies a home owned by him in that part of Keokuk known as West Keokuk, on behalf of themselves and all other similarly situated and affected property owners and residents of that part of Keokuk, consisting of approximately two thousand persons. The homes of the named plaintiffs are in the vicinity of an industrial district in the southwest part of Keokuk known as Commercial Alley district in which the plant of defendant, Keokuk Electro-Metals Company, is located. It may be observed that although the named

plaintiffs were members of a voluntary association known as West Keokuk Improvement Association, the action was not brought by or on behalf of such association or its members. Nor did plaintiffs' pleadings make any reference to the association or its members or any of them as such.

The petition states that for the several years immediately prior thereto defendant, Keokuk Electro-Metals Company, has so operated its plant as to cause the emission of noxious fumes, smoke, particles, dust, grime and polluted air, which were carried by air upon and into the homes and premises of plaintiffs and others similarly situated, soiling and damaging said properties and their contents, and causing annoyance, inconvenience, discomfort and injury to the health of such persons. Plaintiffs pray that defendant be enjoined from continuing the operation of its plant in such manner as to cause the continuance of such conditions.

Defendant's Answer pleads denials, estoppel by delay, laches and acquiescence, the statute of limitations, and an easement or prescriptive right. Most of the defenses pleaded are based upon operation of its plant for more than thirty years at the same place, which has been and is an industrial and manufacturing district of Keokuk.

The case was tried to the court (Judge Burrows) in January 1951. In February 1951 the court rendered its "Opinion and Interlocutory Decree", finding the operation of defendant's plant, as then conducted, was a nuisance and ordering the same abated by August 1, 1951, and if not so abated, that a writ of injunction issue, enjoining the continuance of the nuisance. Thereafter defendants filed "Motion for new trial and to vacate decree and to enlarge and amend findings of fact and conclusions of law and to modify decree." The death of Judge Burrows delayed the disposition of that motion, which was submitted and overruled in 1953. However, no injunction was ordered and the plant continued to operate. Thereafter the case was appealed to this court. The preparation of the lengthy transcript and record consumed considerable time and the death of the trial attorney for defendant resulted in additional delay. Hence, the case, tried early in 1951, was not submitted to this court until late in 1956.

I.  Rule of Civil Procedure 42 entitled "Class actions" states:

"If the persons composing a class are so numerous that it is impracticable to bring all before the court, such number of them as will insure adequate representation of all may sue or be sued on behalf of all, where the character of the right involved is:

"(a)  Joint or common, or held primarily by one who has refused to enforce it, thereby entitling the class or its members to do so; or

"(b)  Several, and the action seeks to adjudicate claims which do, or may, affect specific property; or

"(c)  Several, and a common question of law or fact affects the several rights, and a common relief is sought."

Defendant moved to strike the parts of the petition alleging this was a class action. The trial court overruled this motion stating the cause of action pleaded was contemplated under R. C. P. 42(c). Defendant assigns this as error.

Rule 42, R. C. P., is substantially the same as rule 23(a), Federal Rules of Civil Procedure, which has been interpreted frequently by federal courts. Subdivision 3 of Federal rule 23(a) is the counterpart of R. C. P. 42(c) which is applicable, "where the character of the right involved is: (c) Several, and a common question of law or fact affects the several rights, and a common relief is sought."

The petition in the case at bar fits each requirement of the foregoing classification. The character of the right involved is several and a common question of law or fact affects the several rights and a common relief is sought. Such a case is often referred to as a "spurious" class suit, as distinguished from so-called "true" and "hybrid" class suits, authorized respectively by the first two subdivisions of the rule. Various courts have said the spurious class suit is only a joinder device in which the rights of those not present are not bindingly adjudicated.

California Apparel Creators v. Wieder of California, Inc., 2 Cir., N. Y., 162 F.2d 893, 897, 174 A. L. R. 481, 489, states: "It does not grant authority to adjudicate finally rights as to nonappearing parties or to confer any additional substantive

rights upon the plaintiffs suing. [Citations] Hence the rights of the rest of the 4500 potential plaintiffs are actually not to be settled here, and we cannot give judgment as though they were."

Among other decisions considering and recognizing the doctrine are: Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; Dickinson v. Burnham, 2 Cir., 197 F.2d 973, 979, certiorari denied 344 U. S. 875, 73 S. Ct. 169, 97 L. Ed. 678; Kainz v. Anheuser-Busch, Inc., 7 Cir., 194 F.2d 737, certiorari denied 344 U. S. 820, 73 S. Ct. 17, 97 L. Ed. 638; Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84; Martinez v. Maverick County, etc., 5 Cir., 219 F.2d 666, 672; Pentland v. Dravo Corp., 3 Cir., 152 F.2d 851, 852; Knowles v. War Damage Corp., 83 U. S. App. D. C. 388, 171 F.2d 15, 18, certiorari denied 336 U. S. 914, 69 S. Ct. 604, 93 L. Ed. 1077.

Moore's Federal Practice, Second Edition, Volume 3, page 3443, states, with reference to the spurious class suit:

"When a suit is brought by or against such a class, it is merely an invitation to joinder—an invitation to become a fellow traveller in the litigation, which may or may not be accepted. It is an invitation and not a command performance. Assume that a railroad negligently sets fire to property, and widespread damage to many property owners ensues. Here there is a question of law or fact common to many persons.

"* * * The judgment would bind A, B, C, and privies * * * but would not bind others beyond the principle of *stare decisis,* which operates as to all judgments."

See also "The 'Common Questions' principle in the Code provisions for representative suits", 30 Michigan Law Rev. 878; Class Suits and the Federal Rules, 22 Minnesota Law Rev. 34, 54.

▆▆ So in the case at bar the statement in the petition that the suit was brought as a class action, etc., was merely an invitation to others in the class to intervene in the case. The holding of the trial court that this pleading was proper under R. C. P. 42(c) was correct.

However, it does not appear that any unnamed member of the so-called class accepted the invitation of plaintiffs to join them in the action. The plaintiffs named in the petition and

defendant were the only parties to the action. Plaintiffs have represented no one other than themselves. It does not follow from this, that the court should have dismissed the action. The failure of others to join did not invalidate the action on behalf of the named plaintiffs. The judgment in such action would be binding upon the named plaintiffs, the defendant and their privies. It would not bind others beyond the principle of stare decisis. Hence, the trial court did not err in overruling this ground of defendant's motion to dismiss.

II. Code section 657.1 provides, "* * * a civil action by ordinary proceedings may be brought to enjoin and abate the same [a nuisance] and to recover damages sustained on account thereof." This case was brought and tried to the court as an action at law. Defendant contends that, because damages were not sought, section 657.1 was not applicable and the case should have been brought in equity.

Defendant's failure to pursue the remedy afforded by statute for the correction of the assigned error for bringing the action at law precludes consideration of this complaint. Code sections 611.7 and 611.9 provide an error as to the kind of proceedings adopted shall not cause the abatement or dismissal of the action, but merely a change into the proper proceedings, and a transfer to the proper docket, and that defendant may have the correction made by motion at or before the filing of answer. Here defendant failed to make such motion. This operated as a waiver of its right, if any, to such transfer. Wright v. Copeland, 241 Iowa 447, 450, 41 N.W.2d 102; McManis v. Keokuk Savings Bank & Trust Co., 239 Iowa 1105, 1110, 33 N.W.2d 410, 412; Vosges v. Clark, 240 Iowa 1108, 1110, 38 N.W.2d 611, 613, and citations.

III. Keokuk is an industrial city. Its 1950 population was about sixteen thousand. In its southwest corner is a district known as Commercial Alley district, which occupies a narrow strip of bottom land one and one-fourth mile in length, along the bank of the Mississippi River. A steep bluff separates this strip of land from other parts of the city. From its beginning, Commercial Alley district has been an industrial district, occupied by railroad yards and factories. Defendant's plant has operated there since 1916 and at the time of trial had more than

six hundred employees with an annual payroll of more than $2,000,000. It is located at the west end of the district, which is the farthest from the residential districts in the city. There are no residences south, east or west of it. The nearest residence of any plaintiff is six hundred feet from defendant's plant. The distance from the plant of the others varies from one-fourth to three-fifths mile.

Defendant's plant commenced operations in 1916. It then consisted of one small furnace. Additional furnaces were installed in 1919, 1926 and 1929, and a larger furnace in 1940. In 1942 the United States Government installed two larger furnaces which it leased to defendant for the production of materials necessary to the prosecution of the war. These furnaces were later sold to defendant but the Government continued to use its products.

Defendant's product is classified as a ferro alloy, the essential of which is ferro silicon. Its primary product is silvery pig iron, of which it is the largest producer in the country. This and other alloys produced by defendant are used in the manufacture of metals and materials for military and other purposes. They are generally made by melting a mixture of certain rock and metal ingredients in open-hearth electric furnaces, at 4000 degrees centigrade. Impurities are removed by stirring and skimming the molten mass as it cools and it is finally poured into forms ready for market. In the melting operation about 1.4% of carbon is formed and as the mass cools approximately half of this escapes into the atmosphere in the form of graphite and part of it intermingles with the smoke and gas which flows from the cupola of each furnace. The graphite in the effluent is in the form of glistening or sparkling particles. It is a crystalline form of carbon. The record indicates it is inert, is not toxic and that the amount in the air in and around defendant's plant itself has not been directly harmful to health.

However, the evidence for plaintiffs showed that winds from certain directions carried this effluent upon premises and into houses in the vicinity, leaving black marks upon them as well as upon clothing and household goods, and affecting the comfort of the occupants.

In 1942 defendant constructed and placed in operation a powerhouse, to supplement the electricity secured from Keokuk dam power. It burns two hundred and fifty tons of coal per day and was designed to operate without making excessive smoke. The coal is powdered and the coal burning and gas and smoke consuming equipment is efficient so that the smoke is of a low density and the percentage of escaping gases and fly ash is not large. There are seven other coal burning plants in the Commercial Alley district. The smoke from defendant's powerhouse does not contain the graphite found in the effluent from the furnaces, to which plaintiffs' complaints and the judgment of the trial court were primarily directed.

The first complaint shown in the record was made late in 1946 or early in 1947 by a group called West Keokuk Improvement Association of which plaintiffs were active members. This group conducted an antismoke campaign. They held a meeting with the city council. A representative of defendant and representatives of two other industrial plants attended the meeting. Apparently this produced no definite results. Thereafter plaintiffs instituted this action and a similar action against National Carbide Company which operates a carbide plant in the district. National Carbide Company installed a sprinkling system which eliminated 90% of the lime formerly discharged into the atmosphere by its furnaces and plaintiffs dismissed the action against it.

Witnesses for defendant testified to many years of studies in connection with efforts to reduce the volume of effluent from its plant. Various attempts to eliminate the graphite made between 1935 and 1937 were unsuccessful. In 1940 defendant increased the amount of moisture used for that purpose and in 1949 it installed a sprinkler system. This removed only 10% of the graphite.

"The greatest amount of silicon we produced was during World War II, from 1942 through 1944. Prior to 1942 we had more effluent coming from the plant than since then because of the inefficiency of operation. We lost a greater amount of silica in the effluent in those days from 35% down to 5%. The reduction in the effluent is due to improved procedure. * * * In actual

figures we turned out approximately five times as much smoke prior to 1942 as we do now because of the nature of the product we were making at that time. That continued until about 1945. * * * the furnace capacity has been increased but we have practically eliminated the production of higher silicon ferro alloys except during the War under Government orders. As a result the volume of smoke per unit of furnace capacity has decreased, and it has further decreased by the use of mechanical stokers and better practice in firing the furnaces and in cutting down the amount of silica which was wasted in smoke and lost. I would say our present volume of smoke is comparable to that which we had in 1940 after completion of number five furnace."

In 1950 defendant started to install what was called a heavy media and flotation process. With reference to this process the trial court found, "that defendant is now installing equipment at a cost in excess of $200,000 and at an expense of maintenance of some three to five thousand dollars per month and that the said new machinery will eliminate the effluent from the plant."

The decree states, also: "As the defendant is spending a great sum of money to abate this nuisance, and there is testimony that same can and will be abated, this court is not disposed to issue an order of injunction, unless defendant fails within a reasonable time to operate its plant in such a manner as will not constitute a nuisance."

Some parts of the foregoing statements in the findings and decree do not correctly reflect the record. The evidence showed defendant was then installing the equipment for a modified flotation process, that the manufacturer reported it would remove 90% of the sparklers and defendant's officer believed the method would be effective. There was no evidence it would eliminate *all* the effluent. Moreover, it was realized, "we are pioneering this new apparatus."

The record was closed before the modified flotation process was placed in operation. Defendant's reply brief states the system did not reduce the amount of graphite escaping into the air by as much as the estimated 90%. The reply brief tells also of subsequent research and improvements by which the amount of graphite escaping has been reduced by as much as 92%, and of the construction at a cost of approximately $1,500,000 of a fur-

nace of a new type, with covered ladles in lieu of open hearths, which is expected to eliminate 95% of such graphite.

■■ IV. Defendant contends the action was barred by the statute of limitations, and plaintiffs' laches. For the purpose of argument, defendant assumes the plant, as established in 1916, was a permanent nuisance. This premise is not supported by the record. Although the plant itself may be considered permanent, a nuisance caused by its method of operation would be considered temporary. Ryan v. Emmetsburg, 232 Iowa 600, 606 to 611, 4 N.W.2d 435, and citations. Nor would plaintiffs' failure to sooner object to the condition necessarily estop them to maintain the action. Higgins v. Decorah Produce Co., 214 Iowa 276, 282, 242 N.W. 109, 81 A. L. R. 1199. In the language of the trial court: "Plaintiffs did not object to the erection of the plant and the additions thereto, neither did they encourage the building of the same." "Mere delay in bringing suit to enjoin a continuing nuisance is not necessarily such laches or acquiescence as to constitute an estoppel." Smith v. City of Jefferson, 161 Iowa 245, 249, 142 N.W. 220, 221, 45 L. R. A., N. S., 792, Ann. Cas. 1916A 97. However, delay may be one of the factors to be considered in determining the kind of relief to be allowed. Restatement of the Law, Torts, section 939.

V. The trial court concluded defendant's plant was not a nuisance per se, but that a continuing nuisance, which should be abated, was committed by its use and method of operation, for "the dense smoke containing graphite is of such a substantial character that it renders the occupancy and enjoyment of plaintiffs' homes uncomfortable, * * *." The court did not hold this was injurious to health or destructive to property. There was substantial evidence the smoke smudged or soiled buildings, household goods and clothing of those plaintiffs who testified at the trial, disturbing the comfort of them and their families.

■ Code section 657.1, states: "Whatever is injurious to health, indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, * * *." Section 657.2(1), Code of 1950, lists, among other things, any place for the exercise of any manufacture, "which, by occasioning noxious exhalations, offensive smells, or other annoyances,

becomes injurious and dangerous to the health, comfort, or property of individuals or the public." This enumeration does not modify the common-law rule. The term private nuisance has reference to an actionable interference with a person's interest in the private use and enjoyment of his land. In Restatement of the Law, Torts, chapter 40, Introductory note and sections 822 to 831 inclusive, there is an authoritative treatise upon this subject.

This case involves what Restatement of the Law, Torts, section 825 defines as an intentional invasion, in that defendant knew smoke from its furnaces was being carried upon the lands of others. Section 822 considers the elements necessary for the recovery of damages, among which are, that the invasion is substantial and that it is intentional and unreasonable or is unintentional and otherwise actionable. Section 826 states an intentional invasion is unreasonable unless the utility of the actor's conduct, determined by its meritoriousness from the objective legal standpoint, outweighs the gravity of the harm viewed from the same standpoint. Sections 827 and 828 discuss the factors to be considered in determining the gravity of the harm and the utility of the conduct. Sections 830 and 831 refer to elements to be taken into account in considering gravity of harm against utility of conduct. Soukoup v. Republic Steel Corp., 78 Ohio App. 87, 66 N.E.2d 334, sets out these sections and cites supporting authorities.

Many authorities point out that the right of a person to pure air may be surrendered in part by his election to live in a city where the atmosphere is impregnated with smoke, soot and other impurities. These statements are especially applicable to one who elects to live in or adjacent to an industrial district. Moreover, the operation of a lawful industry which would be considered a nuisance in a residential section might not be considered such when conducted in an industrial locality. McGill v. Pintsch Compressing Co., 140 Iowa 429, 118 N.W. 786, 20 L. R. A., N. S., 466; Higgins v. Decorah Produce Co., 214 Iowa 276, 242 N.W. 109, 81 A. L. R. 1199; Jedneak v. Minneapolis General Elec. Co., 212 Minn. 226, 4 N.W.2d 326; Annotation in 24 A. L. R.2d 202, 203.

■ A fair test as to whether the operation of such industry constitutes a nuisance has been said to be the reasonableness of conducting it in the manner, at the place and under the circumstances in question. Casteel v. Town of Afton, 227 Iowa 61, 287 N.W. 245; 66 C. J. S., Nuisances, 744, section 8c.

■ Since 1916 defendant's plant has operated in Commercial Alley district which is now occupied by industrial plants, railroad yards and roundhouses. There are no residences in the district. It has never been other than a heavy industrial district, with industries, in the past, such as sawmills, planing mills, a quarry, a packing house for slaughtering hogs, and a weed-killer factory, the fumes from which destroyed some vegetation in the neighborhood. Defendant's plant has grown and developed with other heavy industries in the district. West Keokuk has developed in the vicinity of and along with this industrial district.

Witnesses for both parties agreed defendant's plant had given off smoke containing graphite particles, from the time it commenced operating. Witnesses for defendant testified the volume of the effluent had not increased since 1940. The testimony of witnesses for plaintiffs was to the contrary. The Public Health engineer acting for the Iowa State Board of Health investigated defendant's plant in 1941, 1943, 1948, and 1950, and made tests of the air in and around it. He testified the graphite was inert and relatively nontoxic. In 1948 he stood in the center of the smoke stream on the hill above defendant's plant, in the area known as West Keokuk, and collected a specimen of air. His analysis of the specimen showed a dust count much less than the recommended safe maximum.

This is an action at law. The trial court found: "the operation of the (defendant's) plant as at present is a continuing * * * nuisance * * *." Although the record is not without dispute, the evidence, viewed in the light most favorable to plaintiffs, is sufficient to support this finding of fact and it will not be disturbed upon appeal. 66 C. J. S. 924, Nuisances, section 128; 39 Am. Jur. 337, Nuisances, section 54.

■ VI. The judgment directed that, if defendant failed to abate the nuisance, a writ of injunction issue, enjoining defendant from operating its plant in such a manner as to cause

the continuation of the nuisance. This was based upon the conclusion that the mere finding a nuisance existed entitled plaintiffs to such an order as a matter of right. With this conclusion we cannot agree.

The introductory note to chapter 40, Restatement of the Law, Torts, states at pages 223 and 224: "A potent cause of confusion as to the meaning and scope of private nuisance lies in the failure to distinguish the action at law from the suit for injunction in equity. * * * it is one thing to say that a defendant should pay damages for the harm his factory is causing, but it is a different thing to say that he must close his factory if the harm cannot be stopped. For the purpose of determining liability for damages for private nuisance, conduct may be regarded as unreasonable even though its utility is great and the amount of harm is relatively small. But for the purpose of determining whether the same conduct should be enjoined, additional factors must be considered. It may be reasonable to continue an important activity if payment is made for the harm it is causing, but unreasonable to continue it without paying."

The text points out that chapter 40 (hereinbefore considered) is limited in scope to liability for damages.

Topic 1 of chapter 48, sections 933 to 943, Restatement of the Law, Torts, is entitled "Appropriateness of Injunction." Section 936 is entitled "Factors of Appropriateness of Injunction." "(1) The appropriateness of injunction against tort depends upon a comparative appraisal of all of the factors in the case, including the following primary factors:" Among the factors listed are the relative adequacy to plaintiff of injunction and other listed remedies, plaintiff's delay in bringing suit, the relative hardship likely to result to defendant if injunction is granted and to plaintiff if it is denied, and the interests of third persons and of the public.

Section 941 considers the relative hardship factor:

"Comment a. Relative hardship—balance of convenience. When a plaintiff proves that a tort has been committed or is threatened and shows that other remedies will not make him whole, an injunction is not to be issued as a matter of course. Elementary justice requires consideration of the hardship the

defendant would be caused by an injunction as compared with the hardship the plaintiff would suffer if injunction should be refused. But 'balance of convenience' is not the proper test. This term suggests a nice measure of relative advantages and denial of injunction if the scales tip in the defendant's favor. The law does not grant an injunction merely because of the advantage which the plaintiff might reap from it, and it does not refuse an injunction merely because of the convenience which that refusal might afford the defendant. The problem is more complex than that. It cannot be summed up in any phrase less elastic than 'relative hardship.'

"[Page 712] It may be asked: Having first balanced conflicting interests in order to determine whether there is a nuisance, with the conclusion that a nuisance exists, why should the court balance interests again on the question of granting or refusing injunction? The answer is that what may be a tolerable adjustment when the result is only to award damages for the injury done, may lead to extortion if the injunction seriously curtails the defendant's enjoyment of his land."

Section 942. The interests of third persons and of the public are factors to be considered in determining the appropriateness of injunction against tort:

"Comment a. * * * the public interests of the local community and the interests of the public in various social policies, must often be balanced against other factors in the determination of the appropriateness of injunction against tort.

"Comment c. * * * The local community sometimes has a public interest at stake. For example, it will suffer loss of taxes and purchasing power of workers if an industrial plant which has been found to be a nuisance is ordered to be shut down * * *."

Friedman v. Forest City, 239 Iowa 112, 121, 30 N.W.2d 752, 757, approves and follows the applicable parts of the foregoing doctrines. After noting, upon the authority of the Restatement, that different rules govern the allowance of injunctions and damages in nuisance cases, the decision continues:

"Restatement of Torts states the right to enjoin a nuisance established in such a case is for the court to determine upon a balance of individual and public interests. The text, Volume IV,

page 693, states some of the factors to be considered in determining the appropriateness of injunction are the relative hardship likely to result to defendant if injunction is granted and to plaintiff if it is denied, and the interests of third persons and of the public."

Daniels v. Keokuk Water Works, 61 Iowa 549, 554, 16 N.W. 705, also recognizes the doctrine.

The text in 66 C. J. S., Nuisances, section 118(a) states:

"Under the doctrine of comparative injury and the principle of balancing equities, equitable relief against nuisance may be denied where its award would cause serious injury or inconvenience to the defendant or the public and relatively slight benefit to the complainant.

"* * *.

"These principles are variously referred to as the 'comparative injury doctrine,' or the doctrine of 'the balance of hardship,' or of 'the balance of interests,' or of 'the balance of conveniences.' "

See also annotations in 31 L. R. A., N. S., 881; 6 A. L. R. 1580; 37 A. L. R. 689; 61 A. L. R. 924.

Although they do not attempt to spell out the various elements and details, many decisions accord generally with or recognize such of the foregoing pronouncements of Restatement of the Law, Torts, as may be factually relevant. City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U. S. 334, 338, 53 S. Ct. 602, 603, 77 L. Ed. 1208, 1211, states: "Where substantial redress can be afforded by the payment of money and issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance is undisputable." Some supporting authorities cited are McCarthy v. Bunker Hill & Sullivan Mining etc. Co., 9 Cir., 164 F. 927, 940; Bliss v. Washoe Copper Co., 9 Cir., 186 F. 789; Smith v. Staso Milling Co., 2 Cir., 18 F.2d 736; De Blois v. Bowers, D. C. Mass., 44 F.2d 621.

Alabama decisions state: " 'In this jurisdiction we recognize, in cases seeking injunctive relief, the "comparative injury doctrine," not universally accepted.' " Pritchett v. Wade, 261 Ala. 156, 162, 73 So.2d 533, 537, 538.

Storey v. Central Hide & Rendering Co., 148 Tex. 509, 514, 226 S.W.2d 615, 618, 619, was a suit by home owners to enjoin the operation of a rendering plant. The decision states: "Petitioners take the position that the jury having found the facts constituting the nuisance, they were entitled to the injunction abating the plant as a matter of right. We do not agree. We think that there should have been a balancing of equities in order to determine if an injunction should have been granted." The decision then quotes a statement concerning the doctrine of "comparative injury" or "balancing of equities" which points out that decisions which ignore the doctrine and seemingly authorize the granting of an injunction as a matter of right, where the nuisance is clear, do not represent the weight of authority.

Roy v. Chevrolet Motor Co., 262 Mich. 663, 667, 668, 247 N.W. 774, 776, in denying injunctive relief states it would be inequitable to grant it: "The damage to defendant and to its employees would be far greater than that of which plaintiffs complain." The decision quotes, " '* * * a mode of redress so radical would operate against the interests of all parties and eventuate not only in great public inconvenience, but with a pecuniary severity upon the interests of the defendants entirely disproportionate to the nature and extent of the grievance of complainant Fox.' "

Among like decisions are Bartel v. Ridgefield Lumber Co., 131 Wash. 183, 229 P. 306, 37 A. L. R. 683; Angelina Hardwood Lumber Co. v. Irwin, Texas Civ. App., 276 S.W.2d 407; Heppenstall Co. v. Berkshire Chemical Co., 130 Conn. 485, 35 A.2d 845; Ebur v. Alloy Metal Wire Co., 304 Pa. 177, 155 A. 280.

There is considerable conflict among decisions as to the basic doctrine and various elements thereof and exceptions thereto. This conflict is in part real and in part apparent because of different factual situations.

Plaintiffs cite a number of decisions as contrary to those above cited. They state Arizona Copper Co. v. Gillespie, 12 Ariz. 190, 100 P. 465, affirmed 230 U. S. 46, 56, 33 S. Ct. 1004, 1006, 57 L. Ed. 1384, 1388, is authoritative and controlling. However, the United States Supreme Court there recognized the doctrine, stating:

"Whether * * * a court of equity will restrain the acts of the party complained of, or leave the plaintiff to his action at law for damages, must depend upon the nature of the injury alleged, whether it be irremediable in its nature, or whether an action at law will afford an adequate remedy, and upon a variety of circumstances, including the comparative injury by granting or refusing the injunction."

We will not prolong this discussion by reference to other cases. The doctrine that, in an action of this nature, the appropriateness of injunction depends upon a comparative appraisal of all the factors in the case appears sound and has already been recognized by this court. Hence, it will be here followed.

The record here does not establish a clear and strong case supporting plaintiffs' right to injunctive relief. Nor does it appear plaintiffs have no other adequate remedy. Defendant's long-established business, in an old industrial district of this industrial city, is of much importance to the community. It furnishes the livelihood for a substantial segment of the population of the city. To order it shut down not only would cause hardship to defendant and its employees but also would adversely affect other businesses and employments in the city, the city itself, and the defense potential of the country.

Ever since 1916 some effluent from defendant's plant has been carried by air currents to property in the vicinity. The finding this became a nuisance in the 1940s was based primarily upon the premise the quantity increased in those years. There was no finding it endangered the health of plaintiffs or of their families or caused serious damage to any property. It may be observed that although municipal and other public authorities were aware of the situation, the record does not show any objection or complaint by such authorities. Nor does it appear plaintiffs made complaint until late in 1946 or early in 1947, several years after the start of the period of heavy production for military purposes. This case was not instituted until 1949. Such delay furnishes some support for defendant's contention the condition was not as serious as some of the testimony would indicate. The evidence showed and the trial court found substantial efforts on the part of defendant to reduce the volume

of the effluent. To this end defendant for many years had conducted extensive studies and experiments, at considerable expense. Its equipment has been standard and it is not contended there were any other known devices which defendant should have used. However, defendant's brief states that since the case was submitted to the trial court, defendant's efforts to substantially reduce the volume of escaping graphite crystals have continued and have met with some success.

Reference herein has been made to the erroneous conclusion expressed in the judgment entry that where a nuisance is shown, the injured person is entitled, as a matter of right, to its abatement by injunction, without reference to comparative benefits or injuries. Hence it appears the various factors which should have been appraised in determining the appropriateness of injunctive relief were not given consideration and that this part of the judgment was based upon a misconception of the law. This fundamental error requires that the judgment be modified and the case remanded to the district court.

Plaintiffs are granted leave to amend their petition to claim damages and upon trial each party may introduce additional evidence. Each item of costs upon appeal is ordered taxed to the party who incurred the same.—Modified and remanded.

All JUSTICES concur.