RONALD W. MAHLSTADT, appellee, v. CITY OF INDIANOLA et al., appellants.

No. 49789.

(Reported in 100 N.W.2d 189)

224

December 15, 1959.

M. C. Herrick, of Indianola, for appellants.

Watson, Elgin & Hoyman, of Indianola, for appellee.

Oliver, J.—Plaintiff instituted this suit in equity against the City of Indianola, its mayor and city council, to abate and

enjoin as a nuisance the operation of the city dump for refuse and garbage. Upon trial the court adjudged the dump, as operated, constituted a nuisance, and enjoined its operation, after a date some months thereafter. In the meantime, the judgment ordered the adoption of certain practices in connection with the operation of the dump. Defendants have appealed.

Indianola has a population estimated at 7500. The dump was established by the city in 1923, upon a one-acre tract in an agricultural district, apparently within the city limits. It was enlarged in 1948 by the purchase of two acres of adjoining land and again in 1956 by the purchase from Samuel Kopp of approximately three fifths of an acre. Later in 1956 plaintiff purchased from the widow and heirs of Mr. Kopp the remaining part of the eighty-acre tract from which the land for the dump had been taken. This tract was then agricultural land. Plaintiff platted the part of it adjacent to the dump as Mahlstadt's Park Addition to Indianola and has been developing it by building or moving upon it a half dozen dwellings. Plaintiff's home is one hundred and twenty yards from the dump. In 1958 a church was constructed in Mahlstadt's Addition. However, the church building is farther from the dump and does not directly overlook it as do the houses.

The dump is an open type dump for refuse and garbage which is hauled there by individual residents or a trucker engaged by them. This is deposited along the edge of the existing pile of refuse which had been covered with soil previously, the combustibles in it are burned and it is then leveled and covered with soil leaving a step down for the next dumping. A custodian or superintendent employed by the city has charge of the dump, directs the dumping and does the burning, leveling and covering.

Plaintiff and witnesses for him testified the dump was burning day and night, and when the wind was in a certain direction the smoke in the properties in his addition was heavy and thick and had a putrid odor, dogs were killed on the dump and their bodies and those of other animals were burned there, fire from the dump had burned an alfalfa field; in the spring and summer the area of the dump was infested with rats and with flies which spread to the homes in his addition. He testified also the road

alongside his addition was covered with papers, debris and garbage, which fell out of private vehicles transporting the same to the dump, and such traffic was very heavy on week ends and Sunday mornings. On one occasion he saw, on the edge of the dump, materials from cesspools apparently left there by a sewage truck. Various witnesses for plaintiff gave similar testimony concerning the burning, smoke, odors, rats, flies, papers, debris and garbage in the street leading to the dump, etc. There was no evidence the health of anyone was affected.

Mr. Jack Clemens, regional engineer of the State Health Department, testified for plaintiff that he had driven to the dump but did not examine it. He observed no smoke nor odor. He testified also: An open dump is conducive to the breeding of rats and flies. It requires that combustibles be burned. It is possible to reduce the number of rats and flies by treatments. The department would recommend a sanitary land fill dump if it could be economically operated. The open dump is the most common type in Iowa and is considerably less expensive for a smaller community. Many towns have ordinances requiring the use of covered vehicles in transporting refuse to the dump but complete prevention of the dropping of refuse on the road is difficult. According to common experience, a locked gate at the entrance to a dump when the caretaker is absent results in the dumping of garbage at the gate.

Mr. Sherry Robinson, chief of the Environmental Sanitation Section for Des Moines, testified for defendants, he examined the Indianola dump and "whoever is handling it is doing a pretty good job of covering, considering that it is used for garbage. I was surprised to see it is in as good condition as I found it." Combustibles must be burned as they arrive at a dump of this type, otherwise fires will start and will continue to smolder with underground explosions despite efforts to extinguish them. "I have several times checked the dumps in most cities in Iowa" and "many of them are much worse than the dump in Indianola."

Luther Young, who had managed the dump for thirty-five years, testified many rats were there before a pest control organization started poisoning them, but he had not seen a rat on the dump for several months, nor any evidence of their having re-

cently worked there. He testified also that in 1958 the city had secured and used a modern fog machine for fly control which kept the flies pretty well under control. He works from 8 to 5 except two afternoons and Sundays. People leave garbage and refuse at other times, also. He burns garbage with brush, logs and automobile tires, which occasionally cause some smoke and smell. There is space in the present dump area for deposits for six or eight years more.

A pest control operator testified his company had been engaged by Indianola to keep down rodents on the dump. Their practice is to bait the dump for rats each month. When they started they found a moderately heavy infestation of rats. He testified he had recently carefully inspected the dump for rats and found none. He found some evidence of places where rats had been, but these did not look recent.

A defendant councilman testified the council had recently studied the question of the location and operation of the dump and he had concluded the land fill type of operation (in which the garbage and refuse is placed in a trench, compressed, and covered with soil) was not advisable at that time. One reason was that the city was not financially able to pay for a special machine and a skilled operator. Another reason given was the hauling was not done by the city and hence could not be properly controlled for the successful operation of a land fill dump. The city had considered three other sites for a dump and residents of each neighborhood had filed objections thereto.

I. Defendants pleaded: "That the land * * * used for * * * a dump was purchased * * * by the city * * * from the grantors in plaintiff's chain of title * * * with the knowledge and consent * * * that the same was being purchased for use * * * as a city dump. That the * * * city thereby acquired an implied easement over the land now owned by plaintiff for the continued operation of the city dump * * *. That * * * the said sellers and their heirs and assigns, including plaintiff, were forever estopped and barred from objecting to the use of said land as a city dump."

This pleaded defense is not meritorious. Loughman v. Couchman, 242 Iowa 885, 888, 47 N.W.2d 152, 154, thus states the rule applicable where, as here, there was no written grant of an easement and an easement by implication over the unsold

part of the tract is claimed. "An easement by implication arises only where the use antedates the separation of title. That is, where the owner of an entire tract uses it so a part derives from the other a benefit or advantage of a continuous, permanent and apparent nature, and sells the part in favor of which such benefit or advantage exists * * *."

To the same effect is language in Wilbur v. City of Council Bluffs, 247 Iowa 268, 271, 73 N.W.2d 112, 113; Marshall Ice Co. v. LaPlant, 136 Iowa 621, 629, 111 N.W. 1016, 12 L. R. A., N. S., 1073; Dyer v. Knowles, 227 Iowa 1038, 1043, 289 N.W. 911; McKeon v. Brammer, 238 Iowa 1113, 1119, 29 N.W.2d 518, 522, 174 A. L. R. 1229, 1234; 28 C. J. S., Easements, section 31.

In the case at bar the property included in each of the purchases by the city was previously part of a tract of agricultural land. It is not contended the use of any part of it as a dump antedated the separation of title of that part, from the main tract. Hence, the claimed easement by implication could not have been created.

II. Appellants complain the judgment of the trial court was erroneously based upon an issue not within the pleadings and without support in the evidence. This assignment of error assails a conclusion of law of the trial court, that the approval by the city of the platting of Mahlstadt's Park Addition barred the city from defending the injunction case upon a ground pleaded by appellants. The record shows the proposition upon which the conclusion of law was based was not mentioned in the pleadings or the evidence. The first reference to it is in the Findings of Fact by the court, as follows:

"Although it is not in evidence in this case, it is common knowledge that the city has created a City Planning Commission under the provisions of Chapter 373 of the Code, and that any subdivision or addition to the City of Indianola must be approved by the City Planning Commission before it is submitted to the city council and approved by the city. Even though this is not in evidence, it is such common knowledge in the area that the court will take judicial notice of the creation of the City Planning Commission. Chapter 409 of the Code provides that

plats of subdivisions or additions to a city must be approved by the City Council before they become effective, and in case there is a City Planning Commission that it must be first approved by said commission.

"The court, therefore, finds that Mahlstadt's Park Addition was first submitted to and approved by the City Planning Commission and then was submitted to and approved by the City of Indianola, acting through its duly elected council members, and that the same was then recorded in the proper county offices of Warren County, Iowa."

Following this, paragraph 3 of the Conclusions of Law of the court refers to appellants' contention that because the dump had been in operation for many years prior to the platting of Mahlstadt's Park Addition and was plainly visible when plaintiff and others acquired the property and built the homes in close proximity to it they cannot now be heard to complain. In considering this contention the trial court stated:

"It is quite apparent to the court from this situation that the City Council knew of Mahlstadt's Park Addition, knew where it was located, knew that the lots were laid out in close proximity to the dump, just as shown on the plat of the addition known in the record as Exhibit 2, and that in spite of this both the City Planning Commission and the City Council apparently approved the plat of the Mahlstadt's Park Addition and from this said it was all right to build homes upon the lots shown in the plat.

"If the city contends and maintains that these houses should not have been built so close to the city dump, then it would seem to the court that it was their duty to do something about it before the plat was approved and made a part of the records, and since the city did not do so, it is not now in a position to complain because these people did go ahead and build upon lots in the Mahlstadt's Park Addition.

"* * *

"It is quite apparent to the court from the evidence in this case that the city by the approval of the plat of Mahlstadt's Park Addition gave at least tacit approval to the building of homes upon the lots in said addition, and that the city under the law

and in equity cannot now be heard to complain and resist an injunction suit based upon nuisance upon this theory which was advanced by the defendants in this case."

We do not agree with this reasoning. There is no suggestion that in platting his addition plaintiff relied upon any conduct or statements of the city plan commission or the council. The only evidence in the record concerning the formation of the addition is a plat and plaintiff's testimony:

"I * * * caused it to be platted." His pleadings recite: "Plaintiff admits that said dump had been in existence for many years prior to the time the plaintiff acquired the land which he owns, and admits that said fact was well known to the plaintiff at the time he acquired and developed said property."

The record makes no mention of the city plan commission. Nor was the city council referred to in connection with evidence of the platting. No estoppel of defendants to resist the injunction suit upon this ground was pleaded or attempted to be proven. To create an estoppel it is essential that there be conduct amounting to false representations or concealment which misleads a party and induces him to act in some way to his detriment. Sefcik v. Sheker, 241 Iowa 571, 575, 41 N.W.2d 709. Here plaintiff makes no claim of any false representations or concealment and admits he purchased, platted and improved the land bordering on the dump with knowledge of the situation. Hence, the conclusion of the trial court that the approval of the plat barred the city from resisting the injunction was erroneous.

The powers and duties of the plan commission and council in connection with plats and the approval thereof need not be here considered. However, we do not agree it would be proper to base such an estoppel upon the approval of a plat by these bodies. See Funnell v. Clear Lake, 239 Iowa 135, 30 N.W.2d 722.

III. We have hereinbefore held defendants were not estopped to show the operation of the dump at that place prior to plaintiff's activities there. Courts have frequently stated that the right of a person to pure air may be surrendered in part by his election to live in a location where the atmosphere is impregnated with smoke, soot and other impurities and that an operation which would be considered a nuisance in a residential locality might not be so considered when conducted in a proper

place. Riter v. Keokuk Electro-Metals Co., 248 Iowa 710, 721, 722, 82 N.W.2d 151, 158, and citations; Higgins v. Decorah Produce Co., 214 Iowa 276, 281, 242 N.W. 109, 81 A. L. R. 1199.

The text in 66 C. J. S., Nuisances, section 8e, page 746, points to the very marked distinction in reason and equity between a long-established business, "which has become a nuisance from the growth of population and the erection of dwellings in proximity to it, and that of a new erection or business threatened in such vicinity; and it requires a much clearer case to justify a court of equity in interfering by injunction to compel a person to remove" such long-established business.

66 C. J. S., Nuisances, section 8c, page 744, states: "In general, a fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case; * * *."

39 Am. Jur., Nuisances, section 197, states, the weight of authority holds that one's coming to a nuisance does not prevent his maintaining action thereon. "But while priority of occupation is not conclusive as to the existence of a nuisance, it is to be considered with all the evidence, and the inference drawn from all the facts proved, in determining whether the use of the property is unreasonable." See East St. Johns Shingle Co., Inc., v. City of Portland, 195 Ore. 505, 246 P.2d 554.

The operation of a city dump is a public service essential to the health and general welfare of the community, and its location should be reasonably convenient for public use. Moreover, where, as here, its location has been apart from residential, business and industrial districts, its prior operation at that place should be given substantial weight in determining the character of the locality, and the reasonableness or unreasonableness of operating it there, in the manner and under the circumstances shown.

IV. One conclusion of the court states the dump is in plain view of the houses in the Mahlstadt Addition, and it is not a pleasant view and obstructs the view of the residents "and their enjoyment of their premises and to that extent the

232

court holds that the unsightly condition is sufficient to constitute a nuisance." When the character of the locality is taken into consideration the record does not support this conclusion. In the photographs the dump appears to be commonplace. That a thing is unsightly or offends the aesthetic sense does not ordinarily make it a nuisance or afford grounds for injunctive relief. Livingston v. Davis, 243 Iowa 21, 30, 50 N.W.2d 592, 27 A. L. R.2d 1237; Smith v. City of Ann Arbor, 303 Mich. 476, 6 N.W. 2d 752, 754, 755.

V. The court found the dump, as operated, was a nuisance, and enjoined its operation. It is the rule that the appropriateness of such an injunction depends upon a comparative appraisal of all the facts in the case, including, among others, the utility of the operation to the public and the relative hardship likely to result to it if injunction is granted and to plaintiff if it is denied. Riter v. Keokuk Electro-Metals Co., supra, 248 Iowa 710, 722 et seq., 82 N.W.2d 151, 159 et seq.; Friedman v. Forest City, 239 Iowa 112, 121, 30 N.W.2d 752, 757; Annotation, 52 A. L. R.2d 1136 et seq.; Smith v. City of Ann Arbor, supra, 303 Mich. 476, 6 N.W.2d 752. In the case at bar the judgment recognized this rule but applied it only in granting defendants a stay of the injunction until October 15, 1959, and for such additional time as might be ordered upon application and hearing.

Amdor v. Cooney, 241 Iowa 777, 785, 43 N.W.2d 136, 141, states:

"A decree in this class of cases should not go beyond the requirements of the particular case. [Citations]

"Further, it is proper, where a nuisance arises from the manner in which property is used, to afford defendants an opportunity, before the issuance of an injunction, to change such use so it will not amount to a nuisance. [Citations]."

In Higgins v. Decorah Produce Co., supra, 214 Iowa 276, 284, 242 N.W. 109, 81 A. L. R. 1199, this court modified a decree dismissing the petition, by enjoining defendants from continuing certain practices.

We hold the enjoining of the operation of the dump went beyond the requirements of this case. The provisions of the

judgment permitting its temporary operation and requiring the adoption of certain practices furnish some indication of the feasibility of permitting its continued operation and requiring the adoption of such practices.

Until the injunction should become effective the practices required by the judgment were: an adequate and effective program of eliminating rats in the dump by poison and flies in the dump and neighborhood by spraying; the erection of a fence on the side of the dump between it and the houses in Mahlstadt's Park Addition, to prevent the blowing to them of papers, etc. from the dump; the prohibition of the dumping of materials from cesspools, etc.; the supervision of the area to prevent the littering of streets with garbage and refuse dropped from vehicles of residents hauling the same to the dump; that dogs be not shot upon the dump and that the bodies of animals be not burned on the dump. In their briefs defendants state they would not object to such requirements in a decree which did not enjoin the operation of the dump.

Apparently the city was already moving in that direction. An ordinance which the city had under consideration would enable it to better control the operation of the dump and the collection and transportation thereto of rubbish and garbage. Modern methods of fly and rat control then employed can be made more effective. With residents of the city prevented from littering roads to the dump with garbage and refuse there should be less rats and flies in the vicinity.

The discomfort from smoke and odor, at times carried over plaintiff's property by the wind, would be lessened by the discontinuance of the practice of burning the bodies of animals in the dump. Reference has been made herein to decisions that one's right to pure air may be surrendered in part by his election to live in a location where the atmosphere is impregnated with smoke and other impurities. Riter v. Keokuk Electro-Metals Co., supra, 248 Iowa 710, 721, 722, 82 N.W.2d 151, 158, and citations. East St. Johns Shingle Co., Inc., v. City of Portland, supra, 195 Ore. 505, 246 P.2d 554.

In Smith v. City of Ann Arbor, supra, 303 Mich. 476, 6 N.W.2d 752, 754, 755, the most serious complaint about a recently established city dump was smoke from the burning of

combustible materials. Upon appeal from a judgment enjoining the operation of the dump the court applied the rule of balancing the equities and ordered that the operation be permitted to continue as long as it complied with certain conditions.

Such a solution appears proper in the case at bar. The judgment of the district court is modified to permit the operation of the city dump at such location as long as such operation complies with the conditions stated in said judgment.

In the arguments it was stated the city had secured a new site for a dump and was building a road to it. However, this court has not been advised 'that the use of the old dump has terminated.

The judgment is modified and affirmed. The costs upon appeal are ordered taxed one half to appellants and one half to appellee.—Modified and affirmed.

All JUSTICES concur.