**Louis STOCKDALE, Plaintiff,**

v.

**AGRICO CHEMICAL COMPANY, DIVISION OF CONTINENTAL OIL COMPANY, Defendant.**

**Civ. No. 69-C-2010-C.**

United States District Court,
N. D. Iowa,
Central Division.
March 21, 1972.

Franklin Jaqua, Humboldt, Iowa, John H. Mitchell, Fort Dodge, Iowa, and William R. King, Des Moines, Iowa, for plaintiff.

Paul Ahlers, Des Moines, Iowa, for defendant.

## MEMORANDUM AND ORDER.

HANSON, Chief Judge.

This matter came on for trial before the Court on June 7, 1971, and trial was concluded on June 20, 1971, subject to the taking of certain depositions by both parties, as agreed, and the record has now been closed and the case submitted.

Historically, the cause now before the Court constitutes the second time consideration and disposition has been made. The former case involved the same plaintiff and the predecessor of the defendant. It bears Civil No. 864 and is evidenced by a Memorandum dated and filed on October 29 1964. (Appendix to Memorandum Opinion of Court: Memorandum Opinion of October 29, 1964).

For several very fundamental reasons, the Court refers to the October 29, 1964, opinion. In the first instance both parties have in the record of this case referred to it in evidence and briefs. Secondly, by referring to the opinion, it will obviate the necessity of repetitive findings. The general operations and physical layout of the defendant's plant is therein set out. The general description of plaintiff's property and farm layout plus location and time of acquisition are the same now as when the previous lawsuit was tried. Last and perhaps most important, the future damages were contingent upon the ultimate skill of defendant in abatement of nuisance and possible injury to others. Possible jurisdiction was actually maintained for further assessment in the event it became necessary.

The Complaint in the present case was filed April 15, 1969, and therein it is alleged that the operation of defendant's plant interferes with plaintiff's enjoyment of his property, is injurious to human and animal health, and makes animal and plant foods grown on plaintiff's property unsafe for human and animal consumption, has damaged the property of the plaintiff and substantially reduced the market value of his property.

The Complaint alleges the existence of a public and private nuisance and prays for abatement and injunctive relief as well as actual and exemplary damages. The Court has had the benefit of exhaustive briefs from both of the parties and having reviewed the numerous exhibits in this matter now makes the following findings of fact:

The first proposition contained in defendant's Brief asserts that the plaintiff has failed to carry his burden of proof to establish that the plant of the defendant constitutes a nuisance, and that the record evidence demonstrates that the

nuisance found to exist at the first trial has been abated.

In the Court's earlier Memorandum filed October 29, 1964, the following statement appears:

"The court finds that under the strict balance of convenience test and because the evidence was strong that the nuisance was abated in 1963, or was about to be abated in 1963, the injunction should not be granted to abate the nuisance."

The evidence shows that since the trial of the earlier case the defendant has followed a consistent program of plant improvement designed to incorporate the latest improvements in the conduct of its plant operations. To this end substantial sums of money have been paid from time to time as itemized in the testimony of Mr. John Doyle, who retired June 1, 1971, as manager of defendant's plant.

These improvements are itemized as follows:

| Year | Improvement | Cost |
|------|-------------|------|
| 1963 | Revamped and added improved and more efficient equipment to the bag house dust collector. | $20,000 |
|      | Installed Venturi scrubber for collection of gases in wet mix department | $ 6,600 |
| 1964 | Replaced glass fabric bags on bag house dust collector with new improved french nylon bags. | $ 6,600 |
|      | Installed additional Gay Lussac Tower in acid plant to further reduce emission of fumes. | $30,000 |
|      | Constructed additional settling pond for wet mix waste disposal. | $ 5,800 |
|      | Replaced french nylon bags with new improved dacron bags on dry type bag house dust collector. | $ 4,600 |
| 1965 | Installed new Venturi scrubber in the continuous ammoniation department. | $95,000 |
| 1967 | Improved Venturi scrubber by installation of better, more reliable source of power. | $ 3,600 |
|      | Purchased standby fan wheel for Venturi scrubber. | $ 3,100 |
| 1969 | Installed new wet impingement type scrubber in superphosphate department. (Approximately half of this money has been spent, the balance is appropriated but not yet spent). | $61,000 |
|      | Installed a new bag house dust collector (wheelabrator) in the continuous ammoniation department on the cooler side of the process. | $24,000 |

Substantial additional funds have also been appropriated to take advantage of any technical developments in the future.

Defendant's efforts to keep abreast of modern technology is well illustrated by the testimony illicited from defendant's witness, Mr. Harold Long.

Plaintiff's Exhibit 112 consisted of proposed Iowa Ambient Air Standards to become effective September 23, 1971.

Ambient air samples taken by the defendant's technologists in April, 1970, revealed that the defendant was at that time well within the standard requirements which were not to be effective until approximately eighteen months later.

It is significant that the plaintiff admitted that according to his own observations emissions from the plant were reduced in the years 1963, 1964 and 1965.

In his efforts to establish the continuation of the alleged nuisance, the plaintiff attempted to show that the emissions from the plant of defendant damaged crops and other vegetation on plaintiff's farm, injured and killed substantial quantities of livestock, damaged his personal health and diminished the value of his real estate.

Numerous forage samples were taken on behalf of the parties and the Iowa State Department of Health. These samples were tested in the laboratories in an effort to ascertain possible damage. The results of these random samples are not consistent; and it is difficult for the Court to point to any particular sample or series of samples and say that they were representative of the general conditions then existing or indicative of harmful or excessive emissions from defendant's plant being cast upon plaintiff's property. In addition, soil samples were taken and tested for fluoride content; but it is impractical under the record in this case for the Court to conclude that defendant's plant was or was not the primary cause for fluorides in the soil on plaintiff's property. For example, a soil sample from a point twelve miles southeast of defendant's plant contained 119 parts per million of fluoride and a sample one-fourth of a mile southeast of defendant's plant contained 121 parts per million of fluoride.

Fluorides are common in nature. Indeed, the record shows that fluorine is a quite common substance almost universally present in the atmosphere at earth level and in varying amounts in almost all the earth itself and in some areas there naturally is a surplus of fluorine in the soil. Normally, it is in a compound form and substantial amounts of fluorides may be found in soil away from any plant or factory.

Samples of harvested corn silage indicated fluoride levels of 33 (possibly 38) parts per million and 15 parts per million which were well within acknowledged tolerable limits for livestock.

Plaintiff made some claim that there was excessive selenium in plants and soil on plaintiff's farm. Inconsistent test results were obtained but the Court finds that the independent tests conducted by the Hygienic Laboratory of the State of Iowa are the most likely to be authentic and representative of actual conditions. Painstaking care was taken in connection with the laboratory analyses by the State Hygienic Laboratory and selective samples of soil and corn leaves were found to be well below tolerable limits.

Plaintiff offered in evidence his Exhibit 60 which was a tabulation of hogs, sheep and cattle which the plaintiff claimed to have been killed by the emissions from defendant's plant. These losses were substantial in numbers. No qualified expert testified that a single death loss was attributable to the emissions from defendant's plant or fluoride poisoning. On the contrary, the record shows that animals examined post mortem at Iowa State University, Fort Dodge Laboratories and by Dr. Harmon, a practicing veterinarian, were found to be diseased from parasites, bacteria or pneumonia. No expert witness attempted to relate such conditions to the operation of defendant's plant.

Similar findings must be made in connection with plaintiff's attempt to relate crop and other vegetation damage to the operation of defendant's plant.

The plaintiff complained particularly regarding his corn crops. Mr. Lou Sullivan, a qualified agronomist, inspected the current corn planting on plaintiff's farm and found an insufficient plant population and irregular planting of the kernels. Plaintiff complained that his corn crops appeared to ripen prematurely and of lack of yield. He used no herbicides, pesticides or chemical fertilizers other than that with which the original seed may have been coated. The record shows that under such conditions top yields may not be anticipated. In addition, the plaintiff has had continuous corn in the tract (development land) south of the east and west road from the time he commenced farming it in 1957.

Gladioli are known to have a particular susceptibility to air borne fluorides. It is a fair inference from the record that gladioli planted by the State Hygienic Laboratory in the Stockdale house yard in 1969 were reported by plaintiff to show no visible stress damage.

Aerial photographs of plaintiff's farm and the surrounding area were taken in September of 1969. A careful examination of these photographs reveals that the corn crop on the Stockdale property appears consistently browner than in adjoining fields of neighbors. The air borne plumes from the stacks of defendant's plant would clearly not follow boundary fence lines and some other cause or causes must have been the reason for the distinctive color of plaintiff's corn crop.

In his attempt to establish the existence of a nuisance, plaintiff pointed to certain physical complaints of himself and his wife. In an effort to substantiate some causal connection between defendant's plant and the physical complaints in question, the plaintiff called Dr. George Waldbott, a physician who practices his specialty of allergy in Detroit. The academic credentials of Dr. Waldbott are impressive, but his testimony did not make a favorable impression on the Court, especially when weighed against the testimony of Dr. F. Eberle Thornton, an orthopedic surgeon practicing in Des Moines who had examined both Mr. and Mrs. Stockdale at the request of defendant.

Dr. Waldbott admitted that he was considered a leading world opponent of fluoridation of drinking water and claims to be the world's first physicist who has carried out research on the effect of fluorides in drinking water on human health. Dr. Waldbott journeyed to Ireland to testify in opposition to a program to fluoridate Irish drinking water, where he found himself in the decided minority against the whole world's most prominent promoters of fluoridation.

Dr. Waldbott has participated in public hearings all over the United States on the matter of fluoridation. In spite of his own participation in such public hearings, in his book, "A Struggle with the Titans" the author states: "It's the quacks and charlatans who give medical testimony at public hearings."

Dr. Waldbott admits that he is "swimming against the stream," and has had difficulty in getting some of his materials published in leading medical journals. Dr. Waldbott claims that the sugar industry has promoted the fluoridation of water to eliminate the cavities in children's teeth so their mothers will feed them sugar foods, and admitted on the stand that his views on fluorides and chronic poisoning by fluorides are contrary to the great weight of authority in the scientific community.

The Court has examined the article on "Neighborhood Fluorosis" authored by Dr. Waldbott. The Court is willing to accept Dr. Waldbott's explanation that his report therein of a female patient with cancer of the prostate was a typographical error but cannot reconcile Dr. Waldbott's narration in his article of the clinical observations made on Mr. and Mrs. Stockdale with the facts. In the article in question Dr. Waldbott reported both as having nosebleeds and chizzola maculae, described as bluish spots on the skin which appear and then suddenly disappear without scarring. Mr. Stockdale unequivocally denied any such symptoms. Mrs. Stockdale likewise denied experiencing nosebleeds, and claimed the only spots she had on her hands and arms left a pit-like scarring. Obviously these spots were not chizzola maculae because Dr. Waldbott emphatically insisted such did not leave marks or pitting. On the claim of selenium poisoning the testimony of Dr. Waldbott is even more doubtful and inconclusive. The symptoms narrated by Dr. Waldbott do not coincide with the clinical findings.

The Court finds that the testimony of Dr. Waldbott is insufficient to sustain any findings by the Court that either the plaintiff or his wife sustained any physical injury or impairment caused by fluorides or selenium or other emissions from defendant's plant.

The Court finds that the plaintiff has failed to sustain his burden to establish that there was any diminution in the market value of his property due to the operation of defendant's plant. Plaintiff claimed that his property, absent defendant's plant would have a value of $160,000. The plaintiff testified: "This property today is worthless. I won't stay there when this case is decided, regardless of what happens I won't live there any longer." The Court is not impressed by this testimony.

Plaintiff's witness, Mr. H. E. Stalcup, testified that the fair market value of the real estate on March 15, 1971, was $85,800. Mr. Stalcup testified as follows:

"Q In other words you feel that within a reasonable time after March 15, 1971, you could go out and find a buyer, a willing buyer, a cash buyer for $85,800.00?

A Yes, sir."

Plaintiff and his wife with their five sons moved to the farm in question in 1956. The farm had been bought on a ten-year contract for $33,750. It appears the five sons spent a substantial part of their growing years on the farmstead and the record fails to indicate that any of the children had a health problem which could be associated with defendant's plant. The children are now grown and have left the family home. The farm was operated throughout the years primarily as a livestock feeding operation. The plaintiff bought livestock and fed them for the market. Consequently, none of the livestock remained on the farm for long periods of time and were therefore less susceptible to chronic fluoride poisoning. Large quantities of feed were brought in from outside sources which would dilute the effect of fluorides ingested by livestock from home grown feeds. While the boys were on the farm, they participated in the farming operations and the operation seems to have been successful.

On the whole record the Court cannot find that the operation of defendant's plant constituted a substantial impairment of the business or social activities of the plaintiff or his family.

The Court finds that upon consideration of the entire record plaintiff has failed to carry the burden of proof. Except as the Court may find necessary in furtherance of its conclusions, these findings are deemed sufficient.

Both parties in this case agree substantially as to the governing law, and in many instances, rely upon the same cases. The Court has studied with interest the attempt of counsel for the respective parties to apply what they believe the facts to be to the law. The evidence here is woefully weak for plaintiff. The facts hereinbefore found by this Court support every tenet of the law as presented by the defendant. The Court accordingly adopts the legal conclusions of the defendant.

In Pitsenbarger v. Northern Natural Gas Co., 198 F.Supp. 665, 672 (D.C. 1961), it is stated:

"The question of what conduct constitutes a nuisance generally resolves itself to a question of fact and involves a determination of whether there is an unreasonable interference with the interest and the use and enjoyment of the complainant's property. In answering this question, '[T]he reasonableness of the interference is determined by weighing the gravity of the harm to the plaintiff against the utility of the defendant's conduct.' Prosser on Torts, 2nd Ed., Sec. 72."

As indicated by this Court in its Memorandum Opinion filed in the first Stockdale lawsuit (Civil No. 864), the Iowa law with respect to nuisances is thoroughly reviewed in the case of Riter v. Keokuk Electro-Metals Co., 248 Iowa 710, 82 N.W.2d 151. The language of the Court's opinion best summarizes the law and the Court herewith quotes from the opinion beginning at page 157 of 82 N.W. 2d:

"Code, § 657.1, I.C.A., states: 'Whatever is injurious to health, indecent, or offensive to the senses, or an obstruction to the free use of property,

so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance * * *.' Section 657.2, Code of 1950, I.C.A., lists, among other things, any place for the exercise of any manufacture, 'which, by occasioning noxious exhalations, offensive smells, or other annoyances, becomes injurious and dangerous to the health, comfort, or property of individuals or the public.' This enumeration does not modify the common law rule. The term private nuisance has reference to an actionable interference with a person's interest in the private use and enjoyment of his land. . . ."

\*    \*    \*    \*    \*    \*

". . . . Section 822 considers the elements necessary for the recovery of damages, among which are, that the invasion is substantial and that it is intentional and unreasonable or is unintentional and otherwise actionable. Section 826 states an intentional invasion is unreasonable unless the utility of the actor's conduct, determined by its meritoriousness from the objective legal standpoint, outweighs the gravity of the harm viewed from the same standpoint. . . ."

\*    \*    \*    \*    \*    \*

"Many authorities point out that the right of a person to pure air may be surrendered in part by his election to live in a city where the atmosphere is impregnated with smoke, soot and other impurities. These statements are especially applicable to one who elects to live in or adjacent to an industrial district. Moreover, the operation of a lawful industry which would be considered a nuisance in a residential section might not be considered such when conducted in an industrial locality. McGill v. Pintsch Compressing Co., 140 Iowa 429, 118 N.W. 786, 20 L.R.A.,N.S., 466; Higgins v. Decorah Produce Co., 214 Iowa 276, 242 N.W. 109, 81 A.L.R. 1199. Jedneak v. Minneapolis Gen. Elec. Co., 212 Minn. 226, 4 N.W.2d 326; Annotation in 24 A.L.R.2d 202, 203. A fair test as to whether the operation of such industry constitutes a nuisance has been said to be the reasonableness of conducting it in the manner, at the place and under the circumstances in question. Casteel v. Afton, 227 Iowa 61, 287 N.W. 245; 66 C.J.S. Nuisances, § 8 c, p. 744."

The aforementioned doctrines of the *Riter* case have been recently reaffirmed by the Iowa Supreme Court in Bates v. Quality Ready-Mix Co., 261 Iowa 696, 154 N.W.2d 852 (1968); Schlotfelt v. Vinton Farmers' Supply Co., 252 Iowa 1102, 109 N.W.2d 695 (1961) and Kellerhals v. Kallenberger, 251 Iowa 974, 103 N.W.2d 691 (1960). Also in Sections 657.1 and 657.2, Code of Iowa (1971), the well settled common-law rules applicable to nuisances have essentially been codified without modification. Bates v. Quality Ready-Mix Co., supra; Kellerhals v. Kallenberger, supra.

■ As stated in Riter, to support a recovery of damages the invasion must be "intentional and unreasonable." In Bates v. Quality Ready-Mix Co., supra, the Court attempted to define the meaning of this phrase at page 857 of 154 N.W.2d:

"A fair test of whether the operation of a lawful trade or industry constitutes a nuisance has been said to be the reasonableness of conducting it in the manner, at the place and under the circumstances in question. Riter v. Keokuk Electro-Metals Co., supra, 248 Iowa 710, 722, 82 N.W.2d 151, 158; Schlotfelt v. Vinton Farmers' Supply Co., supra. Thus the question whether a nuisance has been created and maintained is ordinarily one of fact, and not of law, depending on all the attending or surrounding circumstances. Each case of this nature must depend on its own facts. Casteel v. Town of Afton, 227 Iowa 61, 65, 287 N.W. 245, 247; Amdor v. Cooney, supra, 241 Iowa 777, 780, 43 N.W.2d 136, 139; Kellerhals v. Kallenberger, supra, 251 Iowa 974, 980, 103 N.W.2d 691, 695. See also 66 C.J.S. Nuisances § 22, page

774; 39 Am.Jur., Nuisances, section 47, page 332."

Among the criteria used to measure "unreasonableness" are priority of occupation and location. Funnell v. City of Clear Lake, 239 Iowa 135, 30 N.W.2d 722 (1948). The case of Mahlstadt v. City of Indianola, 251 Iowa 222, 100 N. W.2d 189 (1959) tells us that " . . . 'while priority of occupation is not conclusive as to the existence of a nuisance, it is to be considered with all the evidence, and the inference drawn from all facts proved, in determining whether the use of the property is unreasonable.' " See also Bates v. Quality Ready-Mix Co., supra, and Schlotfelt v. Vinton Farmers' Supply Co., supra, where the Court stated that, "Priority of occupation is a circumstance of considerable weight."

The factors of priority of occupation and location militate strongly in favor of defendant, Agrico Chemical Company. Defendant's plant became operational in 1955. At this time plaintiff operated a livestock sale barn directly across the road to the west of defendant's plant. Plaintiff testified that during this period of time he was fully aware of the odors and effluent emitted from defendant's plant. Nevertheless, with full awareness and knowledge of the matters about which he now complains, a year later Mr. Stockdale purchased the farm on the east side of defendant's plant. At that time, as now, defendant's plant is located in an industrial-agricultural area immediately north of the city limits of Humboldt, Iowa. The immediate surrounding area consists of stock yards, a gravel pit, feed mill, grain and livestock farming operations and other industrial and manufacturing concerns. The nature of the area is best depicted on defendant's Exhibits 146 through 155, inclusive.

The Riter case also requires that the invasion be "substantial." The Restatement of The Law of Torts, Chapter 40, Section 822, comments on clause (b), describes a "substantial invasion" thusly:

"By substantial invasion is meant an invasion that involves more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable interference with the present usability of a person's land before he can have a cause of action under the rule here stated. When an invasion involves a detrimental change in the physical condition of the land, there is seldom any doubt as to the substantially of the invasion. Where, however, the invasion involves only personal discomfort or annoyance, it is sometimes difficult to determine whether the invasion is substantial. The standard for determining the substantiality of such invasions is the standard of normal persons in the particular locality. If normal persons living in the locality would regard the particular situation as definitely offensive or annoying, then the invasion is substantial. If normal persons in that locality would not be definitely annoyed or disturbed by the situation, then the invasion is not substantial even though the idiosyncrasies of the particular plaintiff make it unbearable to him. Rights and privileges in respect to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be using or occupying particular parcels of land at a particular time."

The Iowa Courts have adopted this Restatement rule in Schlotfelt v. Vinton Farmers' Supply Co., supra; Kellerhals v. Kallenberger, supra; Dawson v. Laufersweiler, 241 Iowa 850, 43 N.W.2d 726 (1950); Amdor v. Cooney, 241 Iowa 777, 43 N.W.2d 136 (1950).

Intertwined with the "reasonableness" standard the Iowa decisions hold that there is a related requirement that the Court must "balance the equities." The equities are to be balanced first in deciding the merits of whether a nuisance actually exists, and then in deciding whether an injunction should issue. If the utility of the conduct outweighs the gravity of the harm, plaintiff has no

cause of action. Friedman v. Forest City, 239 Iowa 112, 30 N.W.2d 752 (1948); Riter v. Keokuk Electro-Metals Co., supra; 12 Drake Law Review, The Law of Nuisance in Iowa, 107, 108; 66 C.J.S. Nuisances § 15.

■■ In the context of this general summary of the Iowa law of nuisance several commonly used phrases must be defined. A nuisance per se, or in law, is an act which is a nuisance at all times and under all circumstances. A nuisance per accidens, or in fact, arises where a lawful activity is conducted in such a manner as to be a nuisance; and as previously discussed, this depends upon the facts and circumstances surrounding the activity. 12 Drake Law Review, The Law of Nuisance in Iowa, 107, 108 and citations contained therein. Note, Ill Blows the Wind that Profits Nobody, 57 Iowa L.Rev. 457–505 (1971), contains an excellent dissertation of Iowa law.

Another definitional problem that has sometimes bothered the Iowa Courts is when to classify a nuisance as permanent and when to consider it continuing and subject to abatement. According to Ryan v. City of Emmetsburg, 232 Iowa 600, 607, 4 N.W.2d 435, 440 (1942):

" . . . a permanent nuisance is one of such character and existing under such circumstances that it will be reasonably certain to continue indefinitely in the future. This contemplates that it is at once necessarily productive of all the damage that can ever result from it. Hence the damage is said to be original."

■ A nuisance which is subject to abatement is not permanent. Vogt v. City of Grinnell, 123 Iowa 332, 98 N.W. 782 (1904).

The problem of sampling forage for fluorine content was reviewed in Arvidson v. Reynolds Metals Company, 125 F. Supp. 481, 485 (D.C.1954), aff'd 236 F.2d 224 (9th Cir. 1956). The following language from the decision bears on the matter now under discussion:

"A very extensive program for sampling forage and testing it for fluorine content has been conducted over a period of years in a wide area surrounding defendant's plants. The work has been done by state and college scientists aided and assisted by defendant and others. The results of this work are shown in the agreed facts stated in the pretrial orders and in the evidence. There is little, if any, dispute as to the samples taken and their fluorine content as shown by laboratory measurement, but the interpretation of the data is in conflict. The conflict largely hinges on what part of the fluorine found in the samples is to be considered within the limit naturally and normally found in vegetation and what part is to be charged to deposits presumably emanating from defendant's plants, as to which a great many variable factors, some involving scientific questions not yet fully settled, must be considered. A fair inference from a full consideration of the evidence on this phase of the case is that some part of the fluorine found in the forage at points within the vicinity of plaintiffs' farms during the period in question in these cases is attributable to fluorides escaping from defendant's plants, but the amount and character thereof is a matter of speculation and cannot be determined with any degree of certainty. In all probability some areas in the near vicinity of the plants receive deposits of particulates or solids in a minute and powdery form so fine as not to be observable even by scientific methods. There is no evidence in the record indicating that direct observation has been made of solid deposits on plaintiffs' farms or at any other place as distant from the plants as the nearest of plaintiffs' farms.

A further factor complicating the matter is the necessity of using test data from samples gathered at more or less infrequent intervals at scattered points and attempting to draw inferences from averages of such data as to particular properties not precisely at a sampling station. It is apparent from

the data itself that rather wide variations occur geographically, climatically and by season. When all of these matters are considered it can be seen that any specific finding of fluorine content in forage on the particular property of any plaintiff must very largely if not wholly be a matter of speculation and conjecture."

It is unclear from the thrust of plaintiff's evidence and his brief, whether the claimed crop damage is merged in plaintiff's claim for diminution of the value of his property of his alleged livestock losses or a loss of profits theory.

One of the more recent analysis of the Iowa rule regarding the measure of damage for loss to growing crops is found in Eppling v. Seuntjens, 254 Iowa 396, 117 N.W.2d 820 (1962). The Court there stated at page 402 of 254 Iowa and at page 824 of 117 N.W.2d as follows:

"The proper measure of damage for loss of growing crops is their value in the field at the time of injury or their value in matured condition less the reasonable expense of maturing and marketing. Blunck v. Chicago & N. W. Railway Co., 142 Iowa 146, 155–158, 120 N.W. 737; Tretter v. Chicago & Great Western Ry. Co., 147 Iowa 375, 377, 126 N.W. 339; Id., 154 Iowa 280, 282–283, 134 N.W. 626; Brous v. Wabash Railroad Co., 160 Iowa 701, 704, 142 N.W. 416; Stooker v. Feil, 240 Iowa 876, 878–879, 37 N.W.2d 918, 920; Anno. 175 A.L.R. 159; 25 C.J.S. Damages § 85b, pages 610–613; 15 Am.Jur., Crops, section 72.

Many decisions recognize there is seldom a market for growing crops as such. Tretter v. Chicago & Great Western Ry. Co., supra, 154 Iowa 280, 282, 134 N.W. 626, and citations. Hence by far the most widely accepted method of arriving at their value at the time of destruction is to estimate the probable yield if the crop had not been destroyed, calculate the value of that yield and deduct the value and amount of labor and expense that would have been required, but for their

destruction, to mature, care for and market the crop. Anno. 175 A.L.R. 159, 174–178. And see Iowa cases supra this division.

There is no evidence here of the value or cost of cultivating, harvesting or marketing any growing crop had it not been destroyed. These items might well have come to a considerable amount in 1954 since, according to plaintiff's younger son, the flood occurred in June of that year when the crop must have been far from mature. ' * * * the calculation as made from maturity values must include a deduction of the amount of subsequent labor and expense which would have been but actually was not incurred, the destruction having precluded the same' (citations). Anno. 175 A.L.R. 159, 174.

As to plaintiff's claim for loss of unplanted corn in 1959, no attempt was made to show the cost of seed, planting, cultivating, harvesting or marketing the crop. We assume, without so deciding, there is sufficient evidence the land would have produced 50 bushels of corn per acre if it had not been flooded. However, a finding to this effect would have been strengthened by evidence of the average yield per acre of similar land in the neighborhood."

In the first Stockdale case this Court adopted a similar method for determining crop damage (see Appendix, pages 271–272).

To competently prove crop damage the law requires evidence on the following matters:

1. Normal crop yields on the land in question;

2. The state of the crops growth when allegedly injured.

3. The reasonably anticipated yield without the claimed injury, but taking into consideration disease factors (blight, stalk rot, corn borers, etc.), the type of weather conditions prevalent during the growing season, the kind of crop

planted and nature and quality of seed, and the farming practices employed;

4. The average yield of similar land in the neighborhood where a crop was cultivated using the same farming practices, etc., and not injured;

5. The market value of the crop injured;

6. The market value of the reasonably probable crop without injury;

7. The expenses that would have been incurred to mature, care for, harvest and market the crop, but for the injury.

The record in this case is void of any evidence relating to the above-mentioned elements of proof.

In the case at bar plaintiff produced absolutely no evidence of the value of his property before the trees were allegedly damaged and the market value of the property after damage to the trees. Walters v. Iowa Electric Co., 203 Iowa 471, 212 N.W. 884 (1927). Further, plaintiff did not even attempt in this trial to produce evidence of the value of the trees separate from the land. Grell v. Lumsden, 206 Iowa 166, 220 N.W. 123 (1928). There being no competent evidence concerning the measure of alleged damage to plaintiff's trees, the claim for such damage must be denied.

Plaintiff is engaged in the feeding of sheep, cattle, and hogs on a short term, high volume basis, primarily for the slaughter market. During the years 1963 through 1970 he claims damages to his livestock totaling approximately $190,000.

It appears plaintiff tried this element of his case on two damage theories. The first was for death loss to sheep, cattle and hogs during the years in question. The second theory of recovery seems to be on the basis of anticipated profits which were supposedly lost due to a lack of anticipated weight gain by the sheep, cattle and hogs and a lack of grade or finish on the sheep and cattle.

A considerable portion of plaintiff's testimony was spent on his alleged livestock problems and his claimed losses are summarized on plaintiff's Exhibit 60. Defendant entered timely objections to this entire line of testimony, as well as to plaintiff's Exhibit 60, on the grounds the evidence offered was speculative, conjectural, argumentative, without proper foundation, self-serving, incompetent, irrelevant, immaterial, without probative value in that there was no expert testimony on which such compilations could be accepted or linking any of the claimed damages to defendant's plant, the evidence contained admitted substantial inaccuracies and much of the evidence sought to be elicited was the incompetent opinion and conclusion of the plaintiff. The Court reserved ruling on the objections and received the evidence subject to the objections. Scrutiny of the testimony regarding plaintiff's Exhibit 60 and the objections thereto will clearly show the evidence is not admissible and the testimony must be stricken from the record.

Assuming, for purpose of discussion, the evidence is admissible, it still fails to provide any foundation for a finding of fact favorable to plaintiff. "Whether we consider this case on the basis of negligence or nuisance the first fundamental fact to be proved is that the act or failure to act of defendant produced the result or damage of which plaintiff complains." Bunn v. Standard Oil Co., 251 Iowa 7, 99 N.W.2d 436 (1959); 66 C.J.S. Nuisances § 8 b; Fanelli v. Illinois Central R. Co., 246 Iowa 661, 69 N.W.2d 13 (1955) and citations contained therein. The same axiom is stated in Nizzi v. Laverty Sprayers, Inc., 259 Iowa 112, 143 N.W.2d 312 (1966):

" 'If, upon looking back from the injury, the connection between the negligence and the injury appears unnatural, unreasonable, and improbable in the light of common experience, such negligence would be a remote rather than a proximate cause.' Chenoweth v. Flynn, 251 Iowa 11, 17–18, 99 N.W.2d 310, 314.

Restatement, Second, Torts, § 435(2) provides:

'The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.'

Comment (e) on this subsection states: 'It is impossible to state any definite rules by which it can be determined that a particular result of the actor's negligent conduct is or is not so highly extraordinary as to prevent the conduct from being a legal cause of that result. This is a matter for the judgment of the court formulated after the event, and therefore, with the knowledge of the effect that was produced.' "

In the case of Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 219 N.W. 40 (1928), plaintiff claimed damages for the death and stunting of his hogs after he fed them defendant's disinfectant and wormer. In holding that there was no evidence connecting the use of defendant's product with the death and stunting of the hogs, or showing that such death and stunting were not the result of disease or other natural causes not chargeable to defendant, the Court stated as follows:

"To put it in another way, the plaintiff is bound, as a necessary element of its case, to show that the injuries which its hogs suffered were the direct result of the feeding of this preparation to them. There is no expert testimony introduced in the case, there seems to have been no post mortem of the dead hogs, and there is no testimony directed to the point that the injury to this herd of hogs was the result of the feeding of this preparation to them. It is to be remembered in cases of this character that in the course of events all animals die; in other words death is inherent in all animal creation. Equally so all animal creation is subject to many ailments, ills, and diseases, resulting either in

death or injury to the animal. Therefore, in a case of this kind, proof that the animal died or was permanently injured does not alone establish a case for the plaintiff. In short, plaintiff alleges that these hogs died and injury to the balance of the herd was caused by the feeding of this preparation to them. Plaintiff is bound to prove this else it has not made out a case. Nugent v. Chicago & N. W. R. Co., 183 Iowa 1073, 166 N.W. 592.

The evidence is wholly wanting to connect the death of these hogs with the feeding of this preparation, and equally so as to their stunted growth."

■■ Not only has plaintiff failed to carry its burden relative to proximate cause, but likewise plaintiff failed to produce competent evidence on which to base a proper measure of damages, if an award were determined to be appropriate. The measure of damages for the death of livestock is the difference between their value before the occurrence which caused the deaths and the value of the remains. The rule is stated in the decision of Miller v. Economy Hog & Cattle Powder Co., 228 Iowa 626, 293 N.W. 4 (1940):

"The damage resulting from injury to an animal is the difference in value before and after the injury. There may be other elements of damage such as expense of treatment or temporary loss of use or of produce. But whether an animal is injured or destroyed the total damages ordinarily recoverable may not exceed its value prior thereto." (Citations omitted)

Plaintiff totally failed to present any competent evidence on the value of the various animals at time of death. In fact the only testimony at all on this matter was admittedly sheer speculation and guess by Mr. Stockdale:

"Q Now, yesterday, Mr. Stockdale, I asked you how you arrived at the average on your death losses, the average value on the loss of sheep, and you replied to that but I find in looking back at my notes that I did not

ask you how you arrived at the average value of a steer or a cattle that you set out here in your Exhibit 60. Would you tell the Court how you arrived at the average value of $150?

A Well, of course this is strictly a guess. Feeding some 400-pound cattle, feeding some 1,000-pound cattle and feeding some 700-pound cattle, but I tried to be fair about this. I estimated a 500-pound average all the way through. Some died when they were big, some died when they were small. I took 500 pounds at 30¢ and came up with $150."

Plaintiff's evidence regarding the loss of anticipated profits is even weaker. The Iowa law permits recovery of loss of business profits where the plaintiff shows by a preponderance of the evidence that the loss is the proximate result of defendant's wrongdoing and there is substantial evidence showing the extent of the loss. Plaintiff's evidence is too remote, speculative and conjectural and does not satisfy either requirement.

In Benshoof v. Reese, 250 Iowa 868, 97 N.W.2d 297 (1959) the Iowa Supreme Court found that loss of profits in connection with plaintiff's hog operation was too remote and speculative to submit to the jury. Similarly in Shewry v. Heuer, 255 Iowa 147, 121 N.W.2d 529 (1963), recovery for loss of anticipated profits was denied as being too remote and speculative. See also Hunter v. Baldwin, 268 Mich. 106, 255 N.W. 431 (1934) where it was stated:

"To say that the measure of damages is the loss of profit on the farm would be practically to deny any damages whatever, for as a general rule loss of profits is too speculative to be permitted as a measure of damages."

Parenthetically it should be reiterated that plaintiff's claimed livestock damages are inconsistent with plaintiff's claimed crop damage and loss of value and loss of rental value to his land. The language in Vogt v. Grinnell, 123 Iowa 332, 98 N.W. 782 (1904) adequately covers the point now being urged:

"In the instant case there was evidence that the pasture of 140 acres, with the water of the creek befouled by the sewage, was worthless, while without this its rental value would have been from $2.50 to $3 per acre. There was also evidence that, while cattle ordinarily grow so as to add from 200 to 300 pounds weight during a season, the plaintiff's cattle were no heavier when taken out of the pasture than when put in. This evidence was rightly received as tending to support the claim of loss in value of use of the land. But the plaintiff cannot be allowed both the loss in the value of the use of the land, and also the value of the probable increase in the weight the cattle failed to make. To allow recovery for both would be equivalent to awarding double damages. If other injury could be shown, save the loss of the growth which would have been probable but for the pollution of the stream, probably plaintiff should recover the damages resulting therefrom. But the appellant may concede that he had had the use of the pasture, and base his claim for damages upon the injury to his cattle alone, resulting from drinking the poisonous waters, but for which they would have increased in weight. He should choose, however, on which theory he will rest his demand for damages."

The case of Arvidson v. Reynolds Metal Company, (D.C.Wash.) 125 F. Supp., 481 (1954) is factually very similar to this lawsuit. Like the case at bar, the Arvidson case is a claim for damages and injunctive relief because of alleged damage to farms and cattle from fluorides allegedly discharged from aluminum plants. After carefully reviewing the voluminous evidence in the opinion, the Court reached the following conclusions:

"In the light of the conclusions thus summarized, as well as from a consideration of many phases of the record not particularly mentioned, I have

reached the following basic conclusions on the factual issues of the case: Plaintiffs have not sustained the burden of producing a preponderance of credible evidence to establish (a) fluorine content in the forage on their lands in amounts above non-toxic limits; (b) substantial fluorine content in forage attributable to effluence from defendant's plants; or (c) that plaintiffs' lands or cattle sustained fluorine damage in particulars and amounts that can be determined with reasonable or any certainty."

*     *     *     *     *     *

"Plaintiffs had the burden of establishing by a preponderance of the evidence that the market value of their farms was depreciated and/or that the physical condition and milk producing capacity of their cattle were damaged by fluorides emanating from defendant's plants. Extensive evidence was introduced for such purpose. Defendant's evidence, equally extensive, was to the effect that no depreciation in market value of plaintiffs' farms had occurred and that the maximum possible ingestion of fluorine by plaintiffs' cattle, whether attributable to defendant's plants or otherwise, was well within the amount cattle can take without damage either as to physical condition or milk producing capacity. Plaintiffs' veterinarians testified that plaintiffs' cattle had and were suffering from various conditions ascribed to fluorine; and dairy records purporting to show a loss in milk production were presented. Veterinarians engaged by defendant flatly denied that the physical defects in plaintiffs' cattle were due to fluorine and ascribed them, as well as any apparent decline in milk production, to poor husbandry and other causes and conditions unrelated to fluorine." (*Id.* page 483)

*     *     *     *     *     *

"Plaintiffs may have been sincere in believing that all of the ills of their cattle and all of the unsatisfactory conditions in their dairy operations were due to fluorine damage; however, rarely did a plaintiff voluntarily or readily acknowledge any cattle ailment, damage or unsatisfactory condition as being due to any other cause, no matter how apparent it might be. On the whole, the court was not favorably impressed with the personal testimony of plaintiffs." (*Id.* page 484)

*     *     *     *     *     *

"There is little, if any, dispute as to the samples taken and their fluorine content as shown by laboratory measurement, but the interpretation of the data is in conflict. The conflict largely hinges on what part of the fluorine found in the samples is to be considered within the limit naturally and normally found in vegetation and what part is to be charged to deposits presumably emanating from defendant's plants, as to which a great many variable factors, some involving scientific questions not yet fully settled, must be considered. A fair inference from a full consideration of the evidence on this phase of the case is that some part of the fluorine found in the forage at points within the vicinity of plaintiffs' farms during the period in question in these cases is attributable to fluorides escaping from defendant's plants, but the amount and character thereof is a matter of speculation and cannot be determined with any degree of certainty. In all probability some areas in the near vicinity of the plants receive deposits of particulates or solids in a minute and powdery form so fine as not to be observable even by scientific methods. There is no evidence in the record indicating that direct observation has been made of solid deposits on plaintiffs' farms or at any other place as distant from the plants as the nearest of plaintiffs' farms. A further factor complicating the matter is the necessity of using test data from samples gathered at more or less infrequent intervals at scattered points and attempting to draw inferences from averages of such data as to particular properties not precisely at a sampling station. It is apparent from

the data itself that rather wide variations occur geographically, climatically and by season. When all of these matters are considered it can be seen that any specific finding of fluorine content in forage on the particular property of any plaintiff must very largely if not wholly be a matter of speculation and conjecture." (*Id.* page 485)

In Erekson v. United States Steel Corporation, 260 F.2d 423 (10th Cir. 1958) the court heard 260 witnesses and reviewed reports of 100,000 chemical analyses of vegetation for fluorine and diagnoses of about 12,000 cattle and thousands of sheep. In denying most of the claims presented the court observed that:

"In addition to the forage exposure levels, the scientific proof developed reliable diagnostic aids in determining the damaging effects of fluorine intake on livestock. The first, and most sensitive, is condition of teeth erupting during exposure."

According to the testimony of Dr. Buck there are at least seven factors which must be considered in evaluating the effect of fluoride on an animal. They are, "The level or amount of fluoride ingested, the duration of ingestion time, the type and solubility of the fluoride ingested, the age of the animal at the time of ingestion, the level of nutrition of the animal, stress factors on the animal and individual biological responses of the animal." The state of this record does not permit any factual finding favorable to plaintiff regarding any of the above mentioned factors without resorting to unwarranted speculation and conjecture.

The law in regard to recovery of damages for physical injuries is well established. Plaintiff has the burden of proving the fact and amount of claimed damages and that his damages were directly and proximately caused by the acts or omissions of defendant. Van Wie v. United States, 77 F.Supp. 22, 49 (D.C. Iowa, 1948); 25A C.J.S. Damages §§ 144, 162(1) d and 162(6). Obviously, personal injuries which are imaginary and do not exist and those which are speculative and remote in nature are not recoverable. Norlin v. Nolan, 195 Iowa 1208, 193 N.W. 544 (1923).

The general rule stated above was applied in B-W Acceptance Corp. v. Saluri, 258 Iowa 489, 139 N.W.2d 399 (1966). In finding a "paucity of damage evidence" on certain claimed items of damage the Court stated:

"In order to be entitled to an award of damages, the claiming party has the burden of proving the value of the damages as to each item with some reasonable measure of certainty. 'The rule that uncertainty as to the amount of the damages will not prevent a recovery does not mean that there need be no proof of the amount of the damage. To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which afford a reasonable basis for measuring the plaintiff's loss. The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise and by reference to some fairly definite standard, such as market value, established experience, or direct inference from known circumstances.' 22 Am.Jur.2d, Damages, section 25, page 46."

To recover damages for diminution of land value plaintiff must prove that defendant's plant constitutes a nuisance and that the nuisance is permanent. A nuisance that is abatable is not considered permanent. Ryan v. City of Emmetsburg, 232 Iowa 600, 4 N.W.2d 435 (1942); 12 Drake Law Review, 107, 115. Even though the plant structure may be considered permanent the nuisance caused by its method of operation may be considered temporary. Riter v. Keokuk Electro-Metals Co., 248 Iowa 710, 82 N.W.2d 151 (1957).

When the nuisance is abatable and thus temporary, the measure of damages in the absence of injury to the property itself is the loss in value of the use of the land plus special damages. Schlot-

felt v. Vinton Farmers' Supply Co., 252 Iowa 1102, 109 N.W.2d 695 (1961); Kellerhals v. Kallenberger, 251 Iowa 974, 103 N.W.2d 691 (1960); Vogt v. Grinnell, 123 Iowa 332, 98 N.W. 782 (1904); Wesley v. City of Waterloo, 232 Iowa 1299, 8 N.W.2d 430 (1943). Obviously, as previously written by this Court in its Memorandum pertaining to the first trial (Appendix), the plaintiff cannot recover for specific items which reflect themselves in the value of the use and then also recover for the value of this use. This would be double damages.

To properly consider plaintiff's request for injunctive relief, it must be determined that plaintiff has established by competent evidence of record that defendant's plant constitutes a nuisance and that plaintiff has been damaged thereby or has at least had some interference with the rightful enjoyment of his land. If the Court finds that defendant's plant is not a nuisance, or that the nuisance has been abated, or that there has been no interference with plaintiff's use of his land, then there obviously is no basis for granting an injunction.

Iowa, in determining the appropriateness of injunctive relief in nuisance actions has clearly adopted the "balance of convenience" or "relative hardship" doctrine. In Riter v. Keokuk Electro-Metals Co., 248 Iowa 710, 82 N.W.2d 151 (1957), the Iowa Supreme Court relied heavily on the Restatement of the Law, Torts, and concluded that injunctive relief was inappropriate where plaintiff could obtain redress in monetary damages and where an appraisal of all of the factors in the case showed that closing defendant's plant would cause a hardship to defendant's employees and the community as well.

The cases tell us that injunctive relief is an extraordinary remedy to be granted sparingly, with caution and only in clear cases. Dawson v. Laufersweiler, 241 Iowa 850, 43 N.W.2d 726 (1950); Amdor v. Cooney, 241 Iowa 777, 43 N.W. 2d 136 (1950); 12 Drake Law Review,

The Law of Nuisance in Iowa, at page 113. The general rule is also reported in 66 C.J.S. Nuisances, § 111 a, as follows:

"Injunction against a nuisance does not issue as of course or in every case, and each case will be decided on its particular facts. Equity jurisdiction, in such cases, is exercised sparingly, reluctantly, and cautiously."

The law also states that "injunction against an alleged nuisance will be denied where substantial redress can be afforded by the payment of money, even where the fact of nuisance is clearly established." 66 C.J.S. Nuisances § 111 f; Riter v. Keokuk Electro-Metals Co., supra; Friedman v. Forest City, 239 Iowa 112, 30 N.W.2d 752 (1948). To the same effect see Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1932):

"The question is whether, upon the facts found, an injunction is the appropriate remedy. For an injunction is not a remedy which issues as of course. Where substantial redress can be afforded by the payment of money and issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance is indisputable. This is true even if the conflict is between interests which are primarily private."

See also the case of McNichols v. J. R. Simplot Co., 74 Idaho 321, 262 P.2d 1012 (1953) where on facts similar to those before this Court, plaintiff sought damages and an injunction enjoining operation of defendant's phosphate fertilizer plant as a nuisance. In denying the injunction, as well as damages, the Court stated:

"If damages adequately and completely compensate appellants for injury, past, present and future, both to their building and business and are so founded and awarded, if they recover at all, then no abatement is justified."

The Supreme Court of Idaho was faced with a problem similar to the Stockdale

situation in Koseris v. J. R. Simplot Co., 82 Idaho 263, 352 P.2d 235 (1960). The Court there relied on the Riter case and refused to grant an injunction against the continued operation of a phosphate fertilizer plant. The Court held:

"The comparative benefits and hardships should be weighed in determining whether injunction is the appropriate remedy under the facts and circumstances in a particular case."

\* \* \* \* \* \*

"Applying the theory of the Hansen [Hansen v. Independent School District No. 1, 61 Idaho 109, 98 P.2d 959] case to the case at bar, any injunctive relief should not prohibit Simplot Company from conducting its lawful business; nor prohibit the emission of dust and fumes beyond the quantity that may be emitted upon reasonable control thereof by installation of up-to-date systems of control; nor beyond what is inherent in the industry when conducted consonant with modern methods. Riter v. Keokuk Electro-Metals Company, 248 Iowa 710, 82 N. W.2d 151; King v. Columbian Carbon Company, 5 Cir., 152 F.2d 636."

The Court also notes the recent decision of Boomer v. Atlantic Cement Company, 26 N.Y.2d 219, 309 N.Y.S.2d 312, 257 N.E.2d 870 (1970). Although New York does not follow the balance of convenience doctrine announced in Riter v. Keokuk Electro-Metals Co., supra, the New York Court recognized the problem of permanently enjoining one plant found to be a pollution nuisance, when its operations were no different than the industry as a whole. The Court found that by permitting defendant to pay damages and escape the injunction, the case was resolved in the best and most equitable way.

■ This Court found plaintiff was not entitled to an injunction in the first trial. Certainly the overwhelming, uncontradicted evidence of the things defendant has done since then in the way of pollution control establishes that plaintiff's request for injunctive relief must be denied again.

■ It is axiomatic that under Iowa law punitive damages are not recoverable as a matter of right and can only be awarded when substantial actual damages are allowed. Thus the finding by the Court that plaintiff has failed to carry his burden of proof as to actual damage, plaintiff's claim for punitive damages must also fail.

This Court discussed the above rule of law in Creme Lure Company v. Schwartztrauber, 257 F.Supp. 53, at page 55 (1966) when it stated:

"While there is some split of authority on this question, it is clear that in Iowa there can be no punitive damages without actual damages." (Citations omitted).

■ Since the Creme Lure decision the Iowa Supreme Court has reaffirmed this rule in Golden Sun Feeds, Inc. v. Clark, 258 Iowa 678, at page 685, 140 N.W.2d 158, at page 163 (1966):

"Defendants' claim for exemplary damages also fails as actual damages must be shown before exemplary damages may be allowed. Stricklen v. Pearson Const. Co., 185 Iowa 95, 97, 98, 169 N.W. 628, 629; Kinney v. Cady, 232 Iowa 403, 412, 4 N.W.2d 225, 229; Shannon v. Gaar, 234 Iowa 1360, 1364, 15 N.W.2d 257, 259; Sebastian v. Wood, 246 Iowa 94, 100, 66 N.W.2d 841, 844; Syester v. Banta, 257 Iowa 613, 627, 133 N.W.2d 666, 675."

And again in Claude v. Weaver Construction Co., 261 Iowa 1225, 158 N.W.2d 139, at page 144 (1968):

"As heretofore indicated, it is well established in this jurisdiction, punitive damages cannot be allowed in the absence of an actual damage award. This court has consistently adhered to that principle. See Syester v. Banta, 257 Iowa 613, 627, 133 N.W.2d 666; Clark Bros. v. Anderson & Perry, 211 Iowa 920, 924, 234 N.W. 844; . . ." (Additional citations omitted).

The Iowa cases clearly and consistently hold that exemplary damages are only permissible in cases of fraud, malice, gross negligence, oppression or an illegal

act. In Amos v. Prom, 115 F.Supp. 127 (1953), Judge Graven meticulously summarized the Iowa law as follows:

"Exemplary damages may be awarded where it appears that the defendant is guilty of fraud, see Williamson v. Western Stage Co., 1867, 24 Iowa 171; malice, Sergeant v. Watson Bros. Transp. Co., supra [Iowa, 52 N.W.2d 86]; Bishop v. Baird & Baird, supra [238 Iowa 871, 29 N.W.2d 201]; Schultz v. Enlow [201 Iowa 1083, 205 N.W. 972], supra; Jones v. Van Donselaar, supra [200 Iowa 176, 204 N.W. 416]; Casey v. Ballou Banking Co., 1896, 98 Iowa 107, 67 N.W. 98; Inman v. Ball, 1885, 65 Iowa 543, 22 N.W. 666; Curl v. Chicago, R. I. & P. Ry. Co., 1884, 63 Iowa 417, 16 N.W. 69, 19 N.W. 308; Garland v. Wholeham, 1868, 26 Iowa 185; Williamson v. Western Stage Co., supra; gross negligence, Williamson v. Western Stage Co., supra; Cochran v. Miller, 1862, 13 Iowa 128; Frink & Co. v. Coe, 1854, 4 G. Greene 555; of an illegal act. Ward v. Ward, 1875, 41 Iowa 686; Guengerich v. Smith, 1873, 36 Iowa 587; Garland v. Wholeham, supra. See also Jeffries v. Snyder, 1900, 110 Iowa 359, 367, 81 N.W. 678."

The Iowa Supreme Court cases of Sebastian v. Wood, 246 Iowa 94, 66 N.W.2d 841 (1954) and Syester v. Banta, 257 Iowa 613, 133 N.W.2d 666 (1965), adopt and reaffirm the ruling of Amos v. Prom, supra, relating to exemplary damages.

In all, this Court finally concludes:

1. The plaintiff has failed by its offer of evidence to sustain the burden of proof essential for actionable damage predicated on nuisance.

2. The evidence fails to show that any invasion of plaintiff's property is substantial under its present operation.

3. The operation of defendant's plant is for a lawful purpose and defendant is not unreasonable in conducting it in the manner, at the place, and under the circumstances in question.

4. Slight inconveniences or petty annoyances are not sufficient to constitute substantial invasions of plaintiff's rights.

5. The Court having found under the evidence that the now existing operation of defendant's plant does not constitute a compensable nuisance, the request for compensatory and exemplary damages and injunction must be denied.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for Judgment in this case under Rule 52(a) of the Federal Rules of Civil Procedure.

APPENDIX TO MEMORANDUM OPINION OF COURT:
MEMORANDUM OPINION OF OCTOBER 29, 1964.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| LOUIS STOCKDALE,<br>Plaintiff,<br><br>vs.<br><br>THE AMERICAN AGRICULTURAL CHEMICAL COMPANY,<br>Defendant. | Civil No. 864<br><br>MEMORANDUM. |

This is an action for injunctive relief, compensatory and exemplary damages predicated upon an alleged nuisance. The plaintiff contends that emissions from stacks of the defendant's plant has and is invading his person and property to

the extent that injurious results have obtained.

Many facts essential to an ultimate disposition of the cause are uncontroverted and without dispute. This, of course, would appear to alleviate a numerical finding of facts. The findings, therefore, except as they may appear generally in this memoranda, are as follows:

Louis Stockdale, herein referred to as the plaintiff, is a resident of Humboldt County, Iowa. The plaintiff is the admitted equitable owner of approximately 77 acres of land generally described as the E.½ of the N.W.¼ of Section 36, Township 92, Range 29, West of the 5th P.M., Humboldt County, Iowa. The American Agricultural Chemical Company, herein referred to as the defendant, is a Delaware Corporation with principal place of business in New York, doing business within the State of Iowa with offices in Humboldt County, Iowa. The defendant is the owner and operator of what is commonly referred to as a fertilizer plant located on a tract of land described as the W.½ of the N.W.¼ of Section 36, Township 92, Range 29, West of the 5th P.M., Humboldt County, Iowa. Whereas the plaintiff's real property extends through the N.W.¼ of Section 36, the defendant's does not. It extends south as far as the Chicago and Northwestern Railway. It contains approximately 56 acres north of the railroad in the W.½ of the N.W.¼ of Section 36. It will be observed that these properties are adjacent and within the N.W.¼ of Section 36.

The plaintiff's property is slightly cut by the railroad at the southwest corner and otherwise is bordered by a county road on the south and also a road on the east. The defendant is bordered on the west side by U. S. Highway 169. Both of these properties lie just outside of the city limits of the City of Humboldt.

It appears without dispute that the defendant's plant went into operation in July of 1955. It further appears that the plaintiff went into ownership and occupancy of his premises in May of 1956. For the purpose of disposition of the cause, it will be considered by the court that the plant was owned and operated prior to the plaintiff possessing and occupying his premises. This matter may be of importance as it relates to the law and conclusions hereinafter made. Exhibit J, being a situation plat, has been offered and received without objection. The exhibit has generally been accepted by all parties as to the respective locations of the buildings and their important parts as they relate to both parties. The buildings of the plaintiff are generally in the southeast corner of plaintiff's property and those of the defendant are roughly in the center of its property. Certain chimneys or stacks connected with defendant's operation are referred to as: "Acid Stack", 130 feet high, 50 inches in diameter; "Ammoniator Stack", 81 feet 9 inches high, 15 inches in diameter; "Wet Mix Stack", 60 feet 8 inches high, 4 feet 4 inches in diameter; "Dryer Stack", 96 feet high, 36 inches in diameter; and "Cooler Stack", 62 feet 4 inches high and 4 feet 2 inches in diameter. These stacks are particularly mentioned because it is the emissions therefrom that precipitated the complaint. Of course, some of the stacks mentioned will be of less importance than others. The significance of the type of stack shall appear later. It will be observed that the acid stack is approximately 2,433 feet from the plaintiff's farm home in a southeasterly direction across generally level to rolling land all of which is subject to cultivation or under cultivation. The ammoniator stack is 2,155 feet in the same direction from the farm home.

Although the situation plat does not so show, the plaintiff operated and leased a portion of real estate south of the road and south of his property which has been referred to as the Silbaugh land and contained approximately 26 acres.

Prior to the plaintiff's occupancy of the farm under discussion, he had been employed as a livestock buyer in the

Webster City and Humboldt areas. The plaintiff's education had been in the field of animal husbandry. Prior to May 1, 1956, the plaintiff was engaged in auction sales of livestock and buying of livestock at a location across the road west of defendant's plant. On or about May 1, 1956, along with his wife and five boys he moved to the farm here involved. He engaged in general farming. The emphasis of his operation was on livestock. The grain and forage produced is and has been primarily marketed through the livestock operation.

The farm home was of such proportions that it could be used as an apartment house and the plaintiff had and still has tenants in the apartments.

The plaintiff did not actually farm the property for the rent years of 1956 and 1957. It was at these times leased to his neighbor. He actually took upon himself the entire farming operation in the year of 1958.

It is obvious from the evidence that the area in which the plant is located is more nearly classified industrial than residential. Farm lands seem to lie generally north and east from the plant and a number of different types of business establishments and industries lie west and south.

The evidence clearly establishes that there are emissions originating from defendant's plant in the way of smoke, dust, and chemical residues which travel over and onto plaintiff's property. The evidence is clear that this effluent contains chemical substance that is odorous and irritating to animal life. The evidence indicates that portions of the chemicals emitted do come in contact with the crops, soil, pasture, groves, feed lots, buildings, machinery, fences and livestock of the plaintiff.

Here the defendant is engaged in manufacturing superphosphate fertilizer from phosphate rock. It manufactures the diluted sulphuric acid that is used in the process. The products are mixed and reactions take place which result in chemical compounds.

Heretofore the stacks of the plant have been referred to separately. The acid plant here is the one which has an effluent to which complaint is made. The process here is to convert sulphur liquid to a gas. A catalyst in the form of nitrous oxide is introduced which creates a gas called sulfur trioxide. This $SO_3$ combined with $H_2O$ "Water" will make $H_2SO_4$—Liquid sulphuric acid. This item is used to manufacture fertilizer. It is claimed that from this acid stack $SO_2$ is emitted in such proportions as to cause damage to plaintiff's property.

Exhibit 6 offered in this record indicates the process. The process is referred to as a closed system working under suction. The purpose of the closed system is to keep the gas from escaping, the ultimate end being the elimination of any escape of $SO_2$. After the introduction of sulphur to burner, it goes to a glover tower meeting up with ammonia which has been converted to nitrogen oxides. The nitrogen oxides and water are then channeled into lead chambers. Also water is channeled into the glover tower. Finally, from the lead chambers, the substance is channeled to what is known as two Gay Lussac Towers. It is hoped that at this stage very little, if any, $SO_2$ or other chemicals will escape. It is from the last Gay Lussac Tower that there is contact through a stack to the atmosphere.

The evidence shows there have been changes made since the institution of this law suit. It appears that perhaps as much as $32,000.00 may have been spent on the glover tower and on the Gay Lussac Towers. It is conceded that the purpose of this expenditure was to eliminate as much loss of chemicals such as $SO_2$ as possible. It is obvious these changes would not be made if it were not to improve the loss of emissions from the stack. The evidence indicates that the plant has made progress and has lessened the effluent. It is apparent that these improvements have lessened previous injurious emissions. It is said that the plant is 99% efficient and that

the standard is 97.5 to 98%. It is admitted, however, that the plume is oxides of nitrogen and that $SO_2$ is there though unseen. The question is how much and where will it go and what injury will it cause, if any.

The next step is the making of the phosphate rock and acid. This is referred to as wet mixing. The reaction that takes place makes solid superphosphate, fluorine gases, and water vapor. In this process, water is used to scrub fluorides from the gases and hold it in a pond of hydrofluosilicic acid inside the plant. Here again, in the wet mix stack, the evidence shows an emission of some fluorides and other gases of which complaint is made.

It is admitted here also that there were five scrubbers in the beginning and that now a Venturi scrubber has been added since the beginning of this law suit. It appears this has cost in the neighborhood of $7,000.00. Its admitted purpose is to remove the fluorides.

From the wet mix step the process goes to the ammoniator department. In this process, it is admitted that ammonia, gas, and fluorides in some amount emerge from the ammonia stack.

The next step is a drying process. It is here the dust problems begin. At first, defendant had what is known as cyclones to remove the dust but later changed to what is known as the bagging process. Defendant says that it has expended some $9,000.00 since 1960 to improve the loss of dust and other chemicals through the dryer stack.

The last step seems to involve the cooler stack. The cooling process causes the emission of some fertilizer particles. The defendant here again has instituted that which is referred to as the bagging process. This is still in the process of being installed and the defendant indicates it may cost as much as $70,000.00. In any event, there is a showing that at the present time fertilizer and dust particles are emitting from the cooler stack.

The only other outlets are those referred to as air ventilators which appear to be of little consequence insofar as emissions are concerned.

The evidence indicates that liquid sulphur is now in use at the plant and it is no longer stockpiling sulphur. This is also a change which the company states has cost them the sum of $50,000.00. Thus it appears the elimination of blowing of sulphur from the stockpile as heretofore complained of is no longer of any consequence.

The evidence has established and the court so finds that at present and since the inception of this cause of action, the defendant is and has been making a good faith effort to eradicate the alleged nuisances and resulting damage, and the evidence further indicates that the damage and nuisance, if any, has been lessened.

Further analysis of the evidence as it relates to the many tests, photos, and other documents in evidence and as it relates to expert testimony would serve no purpose. There has been and is great conflict as to the amount of chemical substance invading the person and property of the plaintiff. There is extreme conflict as to the amount of damage to plaintiff's property. Nevertheless, the testimony is clear that there has been such an invasion. Except as to what the court may subsequently find with relation to conclusions hereinafter drawn, a further finding at this juncture of the proceedings appears unnecessary.

The Iowa law with respect to nuisances is set out in Riter v. Keokuk Electro-Metals Company, 248 Iowa 710, 82 N.W.2d 151:

"Code, § 657.1, I.C.A., states: 'Whatever is injurious to health, indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property is a nuisance, * * *.' Section 657.2, Code of 1950, I.C.A., lists, among other things, any place for the exercise of any manufacture, 'which, by occasioning noxious exhalations, offensive smells, or other annoyances,

becomes injurious and dangerous to the health, comfort, or property of individuals or the public.' This enumeration does not modify the common law rule. The term private nuisance has reference to an actionable interference with a person's interest in the private use and enjoyment of his land. . .

Section 822 considers the elements necessary for the recovery of damages, among which are, that the invasion is substantial and that it is intentional and unreasonable or is unintentional and otherwise actionable. Section 826 states an intentional invasion is unreasonable unless the utility of the actor's conduct, determined by its meritoriousness from the objective legal standpoint, outweighs the gravity of the harm viewed from the same standpoint."

In Riter v. Keokuk Electro-Metals Company, supra, the court accepted the test of Section 825 R.S. of Torts to the effect that an invasion is intentional if the defendant knew smoke was being carried upon the land of others. Section 825 states:

"An invasion of another's interest in the use and enjoyment of land is intentional when the actor

(a) acts for the purpose of causing it; or

(b) knows that it is resulting or is substantially certain to result from his conduct."

The court finds that the defendant, American Agricultural Chemical Company, acted for the purpose of causing the invasion and damage to the use and enjoyment of plaintiff's land and that this defendant knew that this damage to the use and enjoyment of the plaintiff's land was resulting and that it was substantially certain to result from defendant's conduct. The recurrent and continuous acts as committed in this case are strong evidence of the intentional type of nuisance. See E. Rauh & Sons Fertilizer Co. v. Shreffler, 139 F.2d 38 (6th Cir.); Denny v. Garavaglia, 333 Mich. 317, 52 N.W.2d 521.

The R.S. of Torts, Introductory Note to Chapter 40, pgs. 220, 221, discusses the types of conduct which result in a nuisance:

"An invasion may be intentional or unintentional. An unintentional invasion may be caused by negligent, reckless or ultrahazardous conduct. . . . . Thus the tort of private nuisance includes intentional harms, and harms caused by negligent, reckless or ultrahazardous conduct."

This statement is supported by the case law. Kinnischtzke v. City of Glen Ullin, 79 N.D. 495, 57 N.W.2d 588; Walley v. Patake, 271 Wis. 530, 74 N.W.2d 130; Randall v. Village of Excelsior, 258 Minn. 81, 103 N.W.2d 131; Denny v. Garavaglia, supra, Iverson v. Vint, 54 N.W.2d 494 (Iowa). This ultrahazardous conduct is defined in R.S. of Torts, Section 520. Defendant violated this rule. See 54 A.L.R.2d 776. Defendant knew there were emissions from the plant which would probably do damage and this conduct was continued for several years. This was ultrahazardous conduct.

The court has found that the invasion was intentional under the test of the Riter case and R.S. of Torts, Section 825, and alternatively, the court finds that the invasion of plaintiff's land was by negligent and ultrahazardous conduct.

The mere fact that there is an interference with the use and benefits of land does not always mean that there is liability for this interference. In Pauly v. Montgomery, 209 Iowa 699, 228 N.W. 648 (Iowa), the court said:

"From their nature, nuisances are classified by some writers as per se or per accidens; by others, as a nuisance in law and a nuisance in fact. Nuisances per accidens or in fact are those which arise where a legitimate business is so conducted as to be a nuisance. It is apparent, therefore, that when the matter under consideration is whether a given matter is a nuisance in fact, depends wholly upon the surrounding facts and circum-

stances, the location where it is claimed said nuisance existed, and the manner and method of conducting the business."

A nuisance in the sense of conduct for which there is liability is conduct which is unreasonable considering the manner in which it is conducted and the place and the circumstances in which it is conducted. As the court said in Riter v. Keokuk Electro-Metals Company, supra:

"A fair test as to whether the operation of such industry constitutes a nuisance has been said to be the reasonableness of conducting it in the manner, at the place and under the circumstances in question. . . .

'For the purpose of determining liability for damages for private nuisance, conduct may be regarded as unreasonable even though its utility is great and the amount of harm is relatively small.' "

The court finds that the defendant's conduct referred to above was unreasonable in the manner conducted at the place and under the circumstances shown by the record. The court finds that the defendant's invasion of the plaintiff's right to the use and enjoyment of plaintiff's land was substantial. The court is allowing damages and not granting an injunction in this case and the court is considering the fact that the utility of the defendant's establishment may be such that an injunction would be inappropriate, and the harm may be such that an injunction would be inappropriate, and yet damages may be allowed. This is explained in Riter v. Keokuk Electro-Metals Company, supra. In this case, the court finds that the utility of the defendant's establishment does not outweigh the gravity of the harm caused in such a manner as would prevent defendant being liable for damages. The authorities which discuss the factors to be considered and the elements to be taken into account in determining the gravity of the harm and the utility of the conduct are set out in Riter v. Keokuk

Electro-Metals Company, supra. They need not be repeated here.

A nuisance per se is an act, occupation or structure which is a nuisance at all times and under all circumstances regardless of location or surroundings. In other words, it is always unreasonable and is not merely unreasonable because of the manner in which it is conducted and because of the place and circumstances. See Priory v. Borough of Manasquan, 39 N.J.Super. 147, 120 A.2d 625; Traylor v. Colvin, 84 So.2d 286 (La. App.); Parker v. City of Fort Worth, 281 S.W.2d 721 (Tex.Civ.App.); Erie v. Gulf Oil Corp., 395 Pa. 383, 150 A.2d 351; Bluemer v. Saginaw Central Oil & Gas Service, 356 Mich. 399, 97 N.W.2d 90.

Conduct which is offensive to and injurious to health is a type of conduct held to be a nuisance per se. Erie v. Gulf Oil Corp., supra; Ladner v. Siegel, 293 Pa. 306, 142 A. 272; Jager v. First National Bank, 125 Conn. 670, 7 A.2d 919. See also Gainey v. Folkman, 114 F.Supp. 231 (D.C.); Signal Mountain Portland Cement Company v. Brown, 141 F.2d 471 (6 Cir.) It is often said that lawful conduct is not a nuisance per se. The conduct of the defendant, however, was not lawful in that it violated Section 657.1 and 2(1) of the Iowa Code. This would be true even though these definitions in the Code do not modify the common law rules applicable to nuisances.

The court finds that the defendant's conduct was a nuisance because of the unreasonableness as a nuisance in fact and that alternatively the defendant's conduct was a nuisance per se. For other authorities, see 12 Drake Law Review 107, The Law of Nuisance in Iowa; Shannon v. Missouri Valley Limestone Company, 255 Iowa 528, 122 N.W.2d 278; Schlotfeld v. Vinton Farmers' Supply Co., 252 Iowa 1102, 109 N.W.2d 695; 92 A.L.R.2d 975; 24 A.L.R.2d 196; 54 A.L.R.2d 765.

In the present case, the defendant's establishment was not a long established business in that area but the defendant had started to operate its plant prior

to the time the plaintiff purchased the land in question. There was evidence that the interference from the plant got substantially and progressively worse during the years following the purchase of the land by the plaintiff. The plant had been located in its present position only for a short time prior to the time the plaintiff purchased the land.

In Mahlstadt v. City of Indianola, 251 Iowa 222, 100 N.W.2d 189, this type of problem is discussed. The court there said:

"We have hereinbefore held defendants were not estopped to show the operation of the dump at that place prior to plaintiff's activities there. Courts have frequently stated that the right of a person to pure air may be surrendered in part by his election to live in a location where the atmosphere is impregnated with smoke, soot and other impurities and that an operation which would be considered a nuisance in a residential locality might not be so considered when conducted in a proper place.

The text in 66 C.J.S. Nuisances § 8e, p. 746, points to the very marked distinction in reason and equity between a long-established business, 'which has become a nuisance from the growth of population and the erection of dwellings in proximity to it, and that of a new erection or business threatened in such vicinity; and it requires a much clearer case to justify a court of equity in interfering by injunction to compel a person to remove' such long-established business.

66 C.J.S. Nuisances, § 8c, p. 744, states: 'In general, a fair test as to whether a business lawful in itelf, or a particular use of property, constitutes a nuisance is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstance of the case.'

. . .

39 Am.Jur., Nuisances, section 197, states, the weight of authority holds that one's coming to a nuisance does not prevent his maintaining action thereon. 'But while priority of occupation is not conclusive as to the existence of a nuisance, it is to be considered with all the evidence, and the inferences drawn from all the facts proved, in determining whether the use of the property is unreasonable.' "

See also Higgins v. Decorah Produce Co., 214 Iowa 276, 242 N.W. 109 and Payne v. Town of Wayland, 131 Iowa 659, 109 N.W. 203 on increase in the nuisance in this type of circumstance. The court finds that, considering this circumstance, the defendant's operation was unreasonable and a nuisance in fact.

Alternatively, the court has found that the defendant's conduct was a nuisance per se, and since such a nuisance is always unreasonable, it is not necessary to decide under that holding whether or not the plaintiff's buying the land after the plant was erected made the defendant's conduct reasonable.

The Iowa court has many times stated that contributory negligence is not a defense to a nuisance where the nuisance is not founded on negligence. The court has only alternatively found the nuisance to be based on this type of conduct so it is appropriate to state that the plaintiff's conduct was at all times free from negligence and his conduct did not contribute to the injuries.

On the issue of damages, the plaintiff alleges in his Complaint the following:

"That the continued operation of the Defendant's said plant has, and will, cause the Plaintiff's property to be uninhabitable as a residence, and will destroy the production of crops on the Plaintiff's land or greatly reduce the production therefrom; and has been and will be, injurious to the health of the livestock raised by the Plaintiff; that in the operation of the said plant, the discharge therefrom permeates the Plaintiff's property so that the Plaintiff and his family and guests and tenants are required to inhale disagreeable and obnoxious odors and

particles; that the dust and small particles and chemicals used and disseminated into the air by the Defendant's operation of the Plant are blown by the wind, and deposited on the trees, garden, decorative plants, windows, doors, furniture, crops, fences, food, buildings and clothing of the Plaintiff and his family, guests and tenants, and collects on the vegetation of the Plaintiff, thereby destroying and killing the trees, plants and vegetation of the Plaintiff, or retarding their growth and ruining and destroying for eating, or selling for consumption, products of the Plaintiff's farm.

That the operation of the Defendant's plant as aforesaid, including the obnoxious and disagreeable odors, the flying dust, chemicals and grit from said plant is such, and causes so much annoyance, discomfort and fear of impairing the health of the Plaintiff, his family, friends and tenants.

That said flying dust and grit and chemicals makes unsafe for human consumption the foods grown and prepared by the Plaintiff and his family.

That the operation of the Defendant's Plant as aforesaid, interferes with the pleasure and enjoyment of the said Plaintiff, and his family, in having guests and friends visit them, and, therefore, deprives the Plaintiff and his family, of the pleasure of said guests and visitors which they have a right to enjoy, unmolested."

The court finds the injuries, at least with the exception of the grove of trees, were not permanent damages as permanent damages are defined in nuisance cases. The court further finds that the defendant's plant was a temporary and not a permanent nuisance. "Although the plant itself may be considered permanent, a nuisance caused by its method of operation, would be considered temporary." Riter v. Keokuk Electro-Metals Company, supra. See also Ryan v. City of Emmetsburg, 232 Iowa 600, 4 N.W.2d 435. In the present case, the defendant's nuisance was caused by the method of operation. The plant was operated in such a manner that large amounts of injurious material escaped. The defendant has now largely or completely remedied this situation by their own testimony and, therefore, it is clear that this was a nuisance by reason of the method of operation that had existed.

The court finds that under the strict balance of convenience test and because the evidence was strong that the nuisance was abated in 1963, or was about to be abated in 1963, the injunction should not be granted to abate the nuisance.

The court finds that the wrong-doing on the part of the defendant was not accompanied by malice or oppression and that accordingly the request for punitive damages should be denied. See Graessle v. Carpenter, 70 Iowa 166, 30 N.W. 392; Sokolowske v. Wilson, 211 Iowa 1112, 235 N.W. 80; Morgan v. Muench, 181 Iowa 719, 156 N.W. 819. The ultrahazardous conduct of the defendant was not in this case sufficient to show malice or oppression.

In answer to the petition, the defendant sets up the defenses of estoppel, waiver and laches. There is no merit in any of these defenses. Mere lapse of time in bringing suit is not a basis for laches. Also, the nuisance got progressively worse during 1958, 1959, and 1960, the first years in which damages are asked for. Certainly, this is not an unreasonable period of time. Also, there is no prejudice to the defendant. The defendant, as explained, did not purchase until 1956 which was prior by about one year to the time the plant started operations. This is no defense to the relief the court is granting because permanent damages to the land are not being granted and because the substantial damage caused by the plant was not effected until sometime after May 1956. All the damages which the court is awarding accrued well within the five years next before the commencement of this action referred to in the defendant's fourth defense. The plaintiff is, of course, the proper party to recover the damages which the

court is allowing. No permanent damages are being allowed.

In 12 Drake Law Review, p. 116, supra, it is stated that "When a nuisance is not permanent but abatable and thus temporary, the measure of damages in the absence of injury to the property itself is in diminution in rental value plus resulting special damages, such as deprivation of the ·comfortable enjoyment of the property." Such language is found in numerous Iowa decisions. See Kellerhals v. Kallenberger, 251 Iowa 974, 103 N.W. 2d 691; Irvine v. City of Oelwein, 170 Iowa 653, 150 N.W. 674, 678; Vogt v. City of Grinnell, 123 Iowa 332, 98 N.W. 782, 783. However, the plaintiff has a right to elect to concede that he has had some use of his land and sue to recover the actual damages to his animals (Vogt v. City of Grinnell, supra), to his crops (Farley v. City of ·Des Moines, 199 Iowa 974, 203 N.W. 287), and his discomfort (Boyd v. City of Oskaloosa, 179 Iowa 387, 161 N.W. 491). The plaintiff cannot recover for specific items which reflect themselves in the value of the use and then also recover for the value of this use. This would be double damages.

Damages for inconvenience and discomfort by reason of a nuisance is discussed in Boyd v. City of Oskaloosa, supra. The court there said:

"Though injurious consequences, such as sickness and injury to property, may be shown proof of inconvenience and discomfort from noisome odors and offensive smells, occasioned by the maintenance of a nuisance, are alone sufficient basis for the allowance of damages. . . .

In Wood on Nuisances, § 886, the author says that:

'In the cause of an action for an injury to the comfortable enjoyment of property by a person in possession, no precise rule for ascertaining the damage can be given, as, in the very nature of things, the subject-matter affected is not susceptible of exact measurement; therefore the jury are left to say what, in their judgment, the plaintiff ought to have in money, and what the defendant ought to pay, in view of the discomfort or annoyance to which the plaintiff and his family have been subjected by the nuisance."

The plaintiff sustained damage by reason of inconvenience and discomfort due to the offensive odors and materials which came to his land from the defendant's plant. The reasonable value of this element of damage from and after December 5, 1960, until the time of trial is $3,000.00.

Where damage to the plaintiff's trees are concerned, it is important and necessary to distinguish between permanent and temporary nuisances and permanent and temporary injuries. It is said that there is no direct relationship between the classification of the nuisance and the classification of the injury. See 50 Iowa Law Review 141, 153. It is possible for a temporary nuisance to result in permanent or temporary damages or both. See Portable Drilling Corp. v. Guinn, 204 Okl. 68, 226 P.2d 923; Mid-Continent Petroleum Corp. v. Fisher, 183 Okl. 638, 84 P.2d 22.

To measure the value of trees independent of the land, the trees must have a value ascertainable separate from the value of the land. Koonz v. Hempy, 142 Iowa 337, 120 N.W. 976; Grell v. Lumsden, 206 Iowa 166, 220 N.W. 123. Shade trees and windbreakers, such as were the plaintiff's trees that were damaged, are generally only valued as part of the realty and not separate therefrom. Walters v. Iowa Electric Co., 203 Iowa 471, 212 N.W. 884 is not a nuisance case but is in point as to the measure of damages for a grove of trees used primarily as a windbreaker for stock and buildings. The court there said:

"The measure of plaintiff's recovery on account of the injury to the trees or grove on the premises is the difference between the market value of the plaintiff's farm as it was before the trees were destroyed or damaged and its market value after the same were de-

stroyed or damaged, without taking into consideration, in estimating the difference in value, the loss or injury to any property except the trees."

The plaintiff produced no estimate according to this test, but only the value of the trees separate of the land. This type of tree cannot be measured separate of the land. Restoration value is not approved in Iowa for this type of injury. Bradley v. Iowa Cent. Ry. Co., 111 Iowa 562, 82 N.W. 996; Rowe v. Chicago & N. W. Ry. Co., 102 Iowa 286, 71 N.W. 409; see C.F. 69 A.L.R.2d 1370.

There are a number of cases on the elements which must be proven in order to recover for damages to crops. In Gable v. The Pathfinder Irrigation District, 159 Neb. 778, 68 N.W.2d 500, the court listed the elements as follows:

"The measure where a crop is injured but not rendered entirely worthless as a result of the acts or omissions of another is the difference between the value at maturity of the probable crop if there had been no injury and the value of the actual crop at the time injured less the expense of fitting for market that portion of the probable crop which was prevented from maturing. . . .

In determining the value of farm products of any year the jury should take into consideration the circumstances which conditioned the probability or improbability of the maturing of the crops in the absence of injury, and all other facts and circumstances shown by the evidence tending to establish such value, which would properly include those arising before, at the time of, and after the injury, for the purpose of arriving at the difference between the value of that crop before and after the injury.

As elements to be considered under the rule the court approved an instruction designating elements which should be considered, as follows: The kind of crops planted, the nature of the land, the kind of season, what crops according to the season the land would ordi-narily yield, the state of the crops' growth when injured or destroyed, the average yield of similar land in the neighborhood where a crop was cultivated in the same way and not injured, the market value of the crop injured and the market value of the reasonably probable crop without injury, the expense that would have been incurred after injury of fitting for market the portion of the crop the wrongful act prevented from maturing, the time of the injury, the circumstances which conditioned the probability or improbability of the maturing of the crops in the absence of injury, and all other facts and circumstances shown by the evidence tending to establish the value.

. . .

There is no purpose to say that there must be evidence on all of the elements proper to be considered, . . . . but it must be said that sufficient of them must be proved to apprise the jury of the pertinent facts and circumstances relating to the particular year and the conditions which obtained at that time with reference to the subject matter."

In Farley v. City of Des Moines, supra, the court said:

"He was entitled to his special damages plus the reasonable market value of the growing vegetables in the field when destroyed in June, 1923, or, the market value of same in a matured condition, less the deductions for the reasonable expense of material and marketing the products."

This is repeated in Eppling v. Seuntjens, 254 Iowa 396, 117 N.W.2d 820, and it is stated that using the estimated probable yield less expenses that would have been required is the most widely accepted method because there is seldom a market for growing crops as such. The estimated probable yield less expenses type method is the method the court will use in this case. See 175 A.L.R. 159, 173, 174. Other cases supporting this measure of damages are American Smelting & R. Co. v. Riverside Dairy & S. Farm, 236 F. 510 (10 Cir.) and E. Rauh & Sons Fertilizer Co. v. Shreffler, supra.

The evidence preponderates in favor of the plaintiff as it pertains to the matter of chemical emissions affecting the plant and animal life growing and living upon his property hereinbefore described.

The amount of damage to crops and live stock is difficult to appraise and the measure as hereinbefore indicated difficult to apply.

The evidence indicates that in 1958 the plaintiff planted approximately 33 acres of corn which received certain damage from emissions from the plant. This acreage yielded approximately 30 bushels per acre less than surrounding land. It was used for the production of silage, and the silage produced from 12 to 15 tons per acre. Surrounding land would produce 20 to 22 tons per acre. Thus it appears that the production by way of silage was decreased approximately 7 tons per acre. It appears that silage was worth approximately $10.00 per ton on the farm. It further appears that in the harvesting of this silage the work is performed on the acre basis. The ensilage cutter would of necessity have to traverse the entire field, and though the production in some fields might be heavier, the cost of ensilage cutting on heavy or light ensilage would make no difference. It further appears that since the ensilage was fed upon the farm that there was no cost in delivery. Considering these factors, the plaintiff would have a loss of approximately $2,310.00.

In 1959, the corn on the 33 acres was picked and was worth approximately $1.00 per bushel and produced 30 bushels per acre less than surrounding fields. Here again, the corn was not delivered to market but was used for feeding purposes with relation to the live stock program. Corn is picked by cornpickers by the acre and the entire field is to be picked and as a result thereof, it would make no difference whether or not the corn yielded heavy or light per acre. So it is that there would be no additional cost by reason of increased production. The yield was lessened by approximately 990 bushels at $1.00 per acre or $990.00.

The same thing occurred in the year 1960 making a loss of $990.00.

In the year 1961, the loss on the 33 acres was a little more than 30 bushels of corn per acre and the price was less. Consequently, the loss for that year would be the sum of $900.00 on the evidence offered and introduced.

In 1962, the corn on the 33 acres was cut for silage and the evidence indicates that the same loss that occurred in 1958 occurred in 1962. The loss was thus $2,310.00.

In 1963, it appears that the 33 acres was seeded down.

It appears that the fair and equitable damages insofar as crop damage is concerned in this cause would be $7,500.00. The court believes that the damage here allowed is modest and there was no evidence on the part of the defendant to rebut the testimony offered. The court has also relied upon the testimony of the plaintiff who was the owner of the land and crops who by education and background appears to have the qualifications necessary to offer and introduce testimony as was received.

The damage as it relates to live stock is extremely difficult to assess. There was ample evidence indicating that both the permeation of the air and the residue on the crops would affect live stock produced.

It does appear, however, from the evidence that the cattle purchased up and through 1960 did not appear to be adversely affected.

Beginning in 1961, the weight gain on cattle appeared to lessen although the same husbandry had been applied at this time as was applied in the past. The first substantial evidence of damage to live stock appears to have occurred beginning in the year 1962 after the purchase of approximately 109 head of calves. Fifty of these were sold in June and the rest in November of that same year. The weight loss on the first 50 is negligible and too conjectural to permit damage. It appears that on the sale of approximately 52 head of these cattle,

certain ensilage beginning in September from what has been indicated as field "A" was used in their feed ration, and for approximately 60 days they lacked approximately .99 per lb. per day of making their usual gain. Thus, it does appear that there was actual loss to this group of cattle in the sum of $936.00. The remaining 7 of the 109 died and there is no evidence that they died as a result of any chemical substance.

It further appears that the plaintiff in the year 1962 purchased 120 head of cattle which he kept for 90 days. The weight gain loss on these cattle was slightly more than 1 lb. per day for 90 days at 24¢ per lb. or a loss of $2,592.00.

It further appears that in 1963 the plaintiff purchased 50 head and sold them in May at 26¢ per lb. and that there was a loss of approximately 1 lb. per day from normal gain for 60 days, or the sum of $780.00.

It appears that from this time on, the plaintiff felt he could no longer raise cattle under these circumstances and abandoned the purchase of cattle.

In any event, it would appear that there was a total loss on cattle in the sum of $4,308.00.

The plaintiff also purchased $300.00 worth of lime in an attempt to cure the emission from the defendant's plant.

The plaintiff also lost $30.00 per acre on 4 or 5 acres for 1962 and 1963. This loss was $200.00.

Wherever the testimony as to damages was not absolutely certain, the court has taken a conservative figure in computing damages. The court finds that all of the above damages were directly and proximately caused by the nuisance constructed by the defendant.

Accordingly, it will be Ordered that the plaintiff have judgment against the defendant in the sum of $15,308.00 together with interest and costs.

It will be further Ordered that the claim for punitive damages be denied and the claim for injunction to abate the nuisance will be denied.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for Judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.

October 29, 1964.

BY THE COURT:

s/ William C. Hanson
William C. Hanson

UNITED STATES DISTRICT JUDGE.